12 Cal.Rptr.3d 356 (2004)
88 P.3d 81
32 Cal.4th 1072
In re the MARRIAGE OF Susan and Gary LAMUSGA.
Susan Poston Navarro, Appellant,
v.
Gary Lamusga, Respondent.
No. S107355.
Supreme Court of California.
April 29, 2004.
Rehearing Denied July 14, 2004.[*]
*358 Law Office of Kim M. Robinson, Kim M. Robinson and Eric H. Zagrans for Appellant.
Vicky L. Barker and Marci Fukuroda for California Women's Law Center, California Women Lawyers, Coalition for Family Equity, California Federation of Business and Professional Women, California National Organization for Women, The Feminist Majority Foundation, Children Now, California Alliance Against Domestic Violence, National Coalition Against Domestic Violence, National Network to End Domestic Violence, San Francisco Women Lawyer's Alliance, Queen's Bench Bar Association of the San Francisco Bay Area, Women Lawyers Association of Los Angeles, Lawyers Club of San Diego, Women For:, National Council of Jewish Women/Los Angeles, Women's Equal Rights Legal Defense and Education Fund, Asian Pacific American Legal Center, Arizona Coalition Against Domestic Violence, Iowa Coalition Against Domestic Violence, Minnesota Program Development Inc., New Jersey Coalition for Battered Women and Pennsylvania Coalition Against Domestic Violence as Amici Curiae on behalf of Appellant.
Law Offices of Joanne Schulman and Joanne Schulman for Margaret A. Gannon, Cheryl Sena, Carole Cullum, Joanne Schulman, Deborah Appel, Patricia Wagner, Leslie Knight, Gloria Sandoval, Stand! Against Domestic Violence, Roy F. Malahowski, Barbara Hart, Lynne Arrowsmith, Nina Balsam, Andrea Farney, Diane Post and Anne Thorkelson as Amici Curiae on behalf of Appellant.
Law Offices of Tony J. Tanke and Tony J. Tanke for Judith S. Wallersten, Paulina F. Kernberg, Joyanna Lee Silberg, Julia M. Lewis, John B. Sikorski and Stephanie Joan Dallam as Amici Curiae on behalf of Appellant.
Carol S. Bruch, Scott Altman, Edward Imwinkelried and Mary Ann Mason for Herma Hill Kay, Grace Ganz Blumberg, Carol S. Bruch, Janice E. Kosel, Frances Olsen, Joan Heifetz Hollinger, Mary Ann Mason, D. Kelly Weisberg, Jan C. Costello, Sheila James Kuehl, John E.B. Myers, Lisa C. Ikemoto, Scott Altman and Janet Bowermaster as Amici Curiae on behalf of Appellant.
Garrett C. Dailey, Oakland, and Steven A. Greenfield for Respondent.
Leanne Schlegel for Minors.
Donald S. Eisenberg, Glendora, for Constance R. Ahrons, William G. Austin, Sanford L. Braver, James H. Bray, Dr. David *359 Demo, Robert Emery, Dr. William V. Fabricius, Dr. Michael Gottlieb, Dr. John Guidubaldi, Dr. Joan B. Kelly, Marsha Kline Pruett, Dr. Michael E. Lamb, Dr Jay Lebow, Dr. Patrick McKenry, Dr. Kay Pasley, Isolina Ricci, John W. Santrock, Dr. Richard A. Warshak, Sidney J. Brown, James R. Flens, Michael A. Fraga, Lyn R. Greenberg, Dr. Neil S. Grossman, Leslye Hunter, Eva Baranoff McKenzie, Nancy Williams Olesen, Gary R. Rick and Jan Tyler as Amici Curiae on behalf of Minors.
Leslie Ellen Shear for Association of Certified Family Law Specialists, Marjorie G. Fuller, Nancy Williams Olesen, Pamela Panasiti Stettner, Michael E. Lamb, Dawn Gray, Joan B. Kelly, Lawrence E. Leone, William G. Austin, Constance R. Ahrons, Harold J. Cohn, Sanford L. Braver, Frieda Gordon, James M. Hallett, Sidney J. Brown, Lynette Berg Robe, Michael Gottlieb, Tammy-Lyn Gallerani, Richard A. Warshak, Kenneth C. Cochrane, Neil S. Gossman, David R. Lane, Maureen Stubbs, Fred Norris, Dianna Gould-Saltman, Carol Silbergeld, Susan Ratzkin, Jeffrey M. Lulow, Dale S. Frank, Leslye Hunter, Ronald S. Granberg, James R. Flens, Rebekah A. Frye, Renée A. Cohen, Tracy Duell-Cazes, Marnee W. Milner, Jacqueline Singer, Erica L. Hedlund, James Livingston, Josephine A. Fitzpatrick, Michael A. Fraga, Timothy C. Wright, Avery Cooper, Lawrence W. Thorpe, Trevor C. Thorpe, Steven R. Liss, Mark J. Warfel, John R. Schilling and Mary McNeil as Amici Curiae on behalf of Minors.
*357 MORENO, J.
In In re Marriage of Burgess (1996) 13 Cal.4th 25, 28-29, 51 Cal.Rptr.2d 444, 913 P.2d 473, we held that a parent seeking to relocate after dissolution of marriage is not required to establish that the move is "necessary" in order to be awarded physical custody of a minor child. Similarly, a parent who has been awarded physical custody of a child under an existing custody order also is not required to show that a proposed move is "necessary" and instead "`has the right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child.' (Fam.Code, § 7501.)" (Id. at p. 29, 51 Cal.Rptr.2d 444, 913 P.2d 473.)
In the present case, the superior court ordered that primary physical custody of two minor children would be transferred from their mother to their father if their mother moved to Ohio. The Court of Appeal reversed, holding that if the custodial parent "has a good faith reason to move ... the custodial parent cannot be prevented, directly or indirectly, from exercising his or her right to change the child's residence" unless the noncustodial parent makes a "substantial showing" that a change of custody is "essential" to prevent detriment to the children. We granted review to determine whether the Court of Appeal in the present case misapplied our holding in Burgess. We conclude that it did and reverse its judgment.
As explained below, we conclude that just as a custodial parent does not have to establish that a planned move is "necessary," neither does the noncustodial parent have to establish that a change of custody is "essential" to prevent detriment to the children from the planned move. Rather, the noncustodial parent bears the initial burden of showing that the proposed relocation of the children's residence would cause detriment to the children, requiring a reevaluation of the children's custody. The likely impact of the proposed move on the noncustodial parent's relationship with the children is a relevant factor in determining whether the move would cause detriment to the children and, when considered in light of all of the relevant factors, *360 may be sufficient to justify a change in custody. If the noncustodial parent makes such an initial showing of detriment, the court must perform the delicate and difficult task of determining whether a change in custody is in the best interests of the children.
The father in the present case satisfied his initial burden of showing that the mother's planned move would cause detriment to the children, requiring a reevaluation of the children's custody. The superior court properly considered the relevant factors and did not abuse its discretion in deciding that a change in primary custody from the mother to the father would be in the best interests of the children if the mother moves to Ohio.

I. Facts
Susan and Gary LaMusga married on October 22, 1988, and had two children: Garrett, who was born on May 5, 1992, and Devlen, who was born two years later to the day on May 5, 1994. The mother filed an amended petition for dissolution of marriage on May 10, 1996, and requested sole physical custody of the children, who were living with her in the family residence. The father objected and requested joint legal and physical custody.
The parties were unable to agree on a visitation schedule and, pursuant to a court order, stipulated to the appointment of Philip Stahl, Ph.D, a licensed psychologist, to conduct a child custody evaluation. Pending this evaluation, the parties agreed to a visitation schedule under which the children would be with their father every Wednesday from 3:30 p.m. to 7:30 p.m. and Sunday from 10 a.m. to 5 p.m. The mother asserted that even this limited visitation with the father was detrimental to the children, causing Garrett to become overly aggressive, disorganized, unfocused, and to regress in toilet training, and causing Devlen to develop a facial tick, a stutter, and a squint.
In a report dated October 10, 1996, Dr. Stahl observed that "there has been a great deal of verbal hostility between Mr. and Mrs. LaMusga for years, at times escalating to some pushing and shoving between them.... Both acknowledge that communication has deteriorated completely and that there is no trust between them. Mrs. LaMusga is concerned that Mr. LaMusga lives in an unsafe environment, doesn't take adequate care of the boys and is not responsive to their needs. She would prefer that his time be even more limited."
"Additionally, Ms. LaMusga has expressed a desire to move with the boys to the Cleveland, Ohio, area.... [¶] In contrast, Mr. LaMusga is quite upset that she wants to take the boys to Cleveland, and describes the environment there as hostile to him. He believes that Ms. LaMusga has attempted to alienate him from both the boys and ... is quite concerned that, if she does get to move, he'll end up having no relationship with his boys whatsoever."
Dr. Stahl opined that, in general, both the mother and the father were "good enough parents," but noted that the mother was "struggling with supporting and encouraging frequent and continuing contact between" the children and their father. Dr. Stahl believed that "each parent has different positive qualities to give to the children and that it is in the children's best interest to maintain a relationship with each of them as they continue to grow." But he noted his concern "about the dynamic of conflict between Mr. and Ms. LaMusga and its impact on the children. They don't speak to one another, their conflict does filter down to the children, and the children do show some evidence of anxiety related to this. Additionally, their charges and counter-charges *361 reflect the extent to which both parents are willing to go to make the other look bad, something that is clearly detrimental to Garrett and Devlen.... [T]he conflict level between the parents is the single-most significant problem, and it has been going on for years."
Dr. Stahl stated that the mother's desire to move to Cleveland "must be balanced with the children's apparent need for frequent and continuing contact with their father and looked at in the context of the parental hostility. As we already observe, it appears that Ms. LaMusga has been reluctant to support additional time or overnight time with the boys and their father, even though they live less than five miles apart. She has been reluctant to support consistent phone calls, as well. As indicated, Ms. LaMusga has concerns about the boys and their functioning and she has chosen to respond to these concerns with efforts at keeping Mr. LaMusga's time rather limited. Additionally, it is this examiner's observation that Ms. LaMusga sees little or no negative impact on the boys at the potential distance in their relationship with their father. While the likelihood of parental conflict will be significantly reduced on a day-to-day basis if Ms. LaMusga is in Cleveland (and that will likely benefit the boys), it is this examiner's observation that we must be concerned about Ms. LaMusga's willingness to follow through on regular and consistent visitation if she is half a country away. [¶] It is this examiner's opinion that the attachment between Garrett and Devlen and their father is strong. However, the children have not reached an age where they can maintain this attachment if they are away from him over long distance and time.... Thus, it is this examiner's observation that a move at this time would be difficult for the boys given their developmental needs. If we add the concern regarding Ms. LaMusga's follow through associated with the current level of conflict, a move might be difficult for the boys."
Following a hearing on November 14, 1996, the superior court awarded the parties joint legal custody of the children, with the mother having "primary physical custody."[1] With the mother's agreement, the father's visitation was increased over a period of months to a final schedule of every Tuesday and Wednesday from 4 p.m. to 7:30 p.m. and every other weekend from Friday at 5 p.m. to Sunday at 6 p.m. Judgment subsequently was entered dissolving the marriage as of December 31, 1997.
On July 6, 1998, the parties stipulated that during the summer, the father would have custody of the children from July 9-15 and August 21-27, 1998, and the mother would have custody of the children from July 17-23 and August 13-19, 1998. The preexisting custody and visitation schedule would apply at all other times. On November 15, 1998, the father filed an order to show cause to have the court establish a holiday visitation schedule, which it did by an order issued on December 8, 1998.
The mother subsequently married Todd Navarro and, on September 16, 1999, gave *362 birth to a daughter. The father also remarried. His wife, Karin, has a daughter from her prior marriage.
On February 13, 2001, the mother filed an order to show cause to modify the visitation order to permit her to relocate with the children to Cleveland, Ohio. She alleged that she had family in the Cleveland area and her husband had received an offer for a more lucrative job there. She noted in her supporting declaration that Dr. Stahl had been reappointed and was conducting an evaluation to determine whether the father's visitation should be increased.
The father objected to the mother's plan to move the children to Ohio and asked that primary custody of the children be transferred to him if the mother moved to Ohio. The father declared that the mother had attempted to alienate him from their sons since their separation and feared that moving the boys to Ohio would result in his "being lost as their father."
On February 26, 2001, Dr. Stahl submitted a supplemental report that did not address the mother's proposal to move to Ohio, which she had made less than two weeks earlier. Dr. Stahl stated that the parents were "at a continued impasse"; the father wanted "equal joint custody of the boys" while the mother wanted to discontinue the boys' midweek visits with their father. He reported some disturbing aspects of the boys' relationship with their father, noting that the boys were very critical of their father, but almost always in rather vague terms. Dr. Stahl observed, however, that the children "seemingly had a good time at their father's home." Once, Dr. Stahl "observed Devlen being affectionate with his dad, but he later denied it."
Dr. Stahl concluded that the boys were "alienated and split in their feelings toward their parents," in part because "[t]hey appear to be very aware of the conflicts between the parents" and appeared to take the mother's side. Dr. Stahl further concluded the children seemed to be "somewhat overindulged," stating: "With their extreme polarization and with their overindulged emotions, both Garrett and Devlen run the risk of having significant struggles emotionally, especially with their peers, and with authority figures. In addition, it is this examiner's impression that both the boys also struggle a bit with difficulties in self-image and feelings of inadequacy in comparison to others." He blamed this, in part, on "their parent's high conflict divorce." Dr. Stahl noted that the mother "does appear to be contributing to the alienation of the boys," although this alienation tended to be "covert" and "unconscious." He observed that the father was "somewhat self-centered and doesn't seem to deal with the boys' feelings that well."
Dr. Stahl recommended that the father be awarded longer periods of visitation and raised the possibility of transferring primary physical custody of the children to their father if the situation did not improve, stating: "Research suggests that alienated children do better with longer rather than shorter blocks of time with each parent, and also that it's helpful if fathers participate with children in the schooling.... I would recommend a schedule in which they are with their father every other week from Thursday after school until return to school on Monday morning and every other week from Thursday after school until Friday morning. Not only does this reduce the number of transitions that need to take place with the parents together, but it also broadens the blocks of time that they are with their dad. It also keeps mother as the primary parent, which is consistent for them." Dr. Stahl noted that if the situation *363 did not improve, he might recommend either "a truly joint custody arrangement" or giving "primary custody" to the father.
Following a hearing on March 19, 2001, the father's visitation was increased as recommended by Dr. Stahl. The court again reappointed Dr. Stahl "to provide a focused evaluation on the issue whether the relocation of the parties' two minor children is in the best interest of said children."
Dr. Stahl's June 29, 2001, supplemental report notes that the mother has wanted to move ever since the divorce but waited, at Dr. Stahl's urging, until the children were older. The move would improve her family's "economic standard of living, and ... inherent quality of life...." The mother "believes that she will have no difficulty supporting the boys in their relationship with their dad," asserting "that she has always supported the boys in their relationship with their dad, and that she is not a contributor to any alienation that the boys might feel. [¶] Not surprisingly, Mr. LaMusga doesn't see things the same way.... He is opposing the move, especially at this time, because he worries that the boys will regress in their relationship with him, especially after making tremendous progress in their work with Dr. Tuggle [the boys' therapist].... He feels strongly that a disruption now will break the bond that is developing."
Dr. Stahl was concerned "that the boys might not maintain any positive relationship with their dad if they move," noting that such a loss "would be significant." But he added that this "must be balanced with the potential losses that the boys might experience if their mother moves, and they stay," observing: "They have been in the primary care of their mother since the parents' divorce and they will likely have a significant loss [if] she moves without them. They also have a very close relationship with their sister Aisley, as well as Todd, and they will feel those losses as well. Third, they have their own desire to move.... If they don't move, they're likely to feel that their wishes aren't being heard." Dr. Stahl also observed that forcing the children to remain in California could cause them to further reject their father.
Dr. Stahl opined that if the boys were permitted to move to Ohio: "The primary loss for the boys will be related to the growing and improving relationship with their dad. I suspect that they'll have few problems adjusting to a new school, friends, or activities, but it may be hard for them to deal with the emerging change in their relationship with their dad. The relationship currently is tenuous at best, for all of the reasons I outlined in the original update, and it is unlikely that there will be no impact to their relationship.... [¶] The underlying risk, however, is that, with absence, they will regress to a more detached and disconnected state with their father. With regular and somewhat increased contact, there is improvement in the relationships. However, this improvement is tenuous, and I am concerned that the move will interrupt any progress that might be occurring at the present time."
Although the mother stated that she wanted to move to Ohio because that "is where she is originally from and where she has family support," Dr. Stahl suggested an additional motive: "Underneath, however, it has always appeared that [the mother] has wanted to move so that she can remove herself and take the boys from the day-to-day interactions with [the father]. She has difficulty dealing with him and prefers to have as little communication with him as possible."
"I am concerned about ways that she might inadvertently or unconsciously provoke loyalty conflicts, as the children are *364 all too aware of her negative dealings toward their father. Her contribution to the conflict is a major contribution to the boys' loyalty conflicts and alienation."
Acknowledging that there was "no good solution in this matter," Dr. Stahl observed that "there is a risk that both moving or not moving may create a significant change" in the children's relationship with their father, stating, "It's difficult to predict which way this will go. Mother believes that the boys will be less rejecting of their dad if they move and father believes that a move will put the nail in the coffin of their relationship. I suspect that neither of them is accurate and the actual reaction of the boys will be based on how the parents handle their issues over time.
"In fact, in my opinion, the critical issue will be mother's `real' behavior after the move takes place. If she acts as she says she will, the boys will talk with their father two or three times per week, and these conversations and communications will be substantive and not superficial. If she acts as she says she will, the boys will enjoy their father's periodic visits to Ohio. If she acts as she says she will, they will get on the plane and come to California for dad's custodial time, and they'll be ready to have a good time with their dad. If she acts as she says she will, it could be that the boys will actually improve in their relationship with their dad, and the gains being made now can continue. [¶] However, the risk is that she won't act as she says she will. If dad is correct, and mother's sister is going to foment the anger, there won't be any support in Ohio for her to act as she says she will. If that's the case, once they get to Ohio, he'll be correct that his relationship with the boys will regress...."
On August 23, 2001, a hearing was held in the superior court on the mother's request to move the children's residence to Ohio. The mother declared that her husband had accepted a position as sales manager at a Toyota dealership in Cleveland, Ohio in March 2001 and had been living in Cleveland with her family since then.
Dr. Stahl testified and responded to a question by the mother's counsel why the mother should not be permitted to move the children to Ohio, stating: "I think the reasons would be twofold: [¶] One, there is no evidence that I've seen in the five years that I've known this family that [the mother] will really do what she said she will do. In terms of being supportive of the boys' relationship with their father in a way that truly will reduce the loyalty conflicts and truly will help them, um, feel better about things with him. [¶] That would be one reason. [¶] The other is it is still a tenuous relationship. And in that it's a tenuous relationship, I'll stick with what I said in 1996: It makes it very difficult to  to predict that it's likely to get better rather [than] stay tenuous or get worse if the move is allowed."
Dr. Stahl acknowledged that the father also bore some of the responsibility for his strained relationship with his sons, stating: "He gets frustrated and impatient sometimes." Dr. Stahl added that the father contributes to the children's alienation to the extent he perpetuates his conflict with the mother.
The superior court ruled as follows: "The issue is not whether either of these parents are competent and qualified to be custodial parents, I think the evidence indicates that they are. That is not the question. [¶] The question is whether there is sufficient evidence at this point to determine, one, that the best interests of the children is served by relocating with Mother to Ohio, or whether the best interests are served by the  a change of physical custody if [the mother] is to relocate."
*365 The court acknowledged that the mother is not purposely trying to alienate the children from their father, but noted that the mother's inability to "let go" of her anger toward the father caused her to project those feelings onto their children and to reinforce the children when they expressed negative feelings toward their father. "That aligns the children with one parent and results in a strained or hostile relationship with the other parent." The court also acknowledged that this was not "a bad faith move away. I don't think this is an instance where [the mother is] attempting to relocate with the children for the specific purpose of limiting their contact or relationship with their father. I think it's far more subtle than that...."
"The primary importance, it seems to me at this point, is to be able to reinforce what is now a tenuous and somewhat detached relationship with the boys and their father.... [¶] I think the concerns about the relationship being lost if the children are relocated at this time are realistic.... [¶] Therefore, I think that a relocation of the children out of the State of California, the distance of 2000 miles is  would inevitably under these circumstances be detrimental to their welfare. It would not promote frequent and continuing contact with the father, and I would deny the request to relocate the children. [¶] If [the mother] wishes to relocate to the state of Ohio, certainly she is entitled to do that. Should she choose to do so, then I would implement the recommendations contained in Dr. Stahl's supplemental report of June 29th of 2001 which would provide for the primary physical custody of the children, at least during the school year, to Mr. Lamusga.... [¶][I]f [the mother] decides not to relocate, then the existing custodial arrangement will remain."
The mother appealed and the Court of Appeal reversed the judgment. The Court of Appeal applied the deferential abuse of discretion standard of review we recognized in In re Marriage of Burgess, supra, 13 Cal.4th 25, 32, 51 Cal.Rptr.2d 444, 913 P.2d 473: "The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the `best interest' of the child." But the appellate court concluded that "although the [superior] court referred several times during the hearing to `best interest' as the applicable standard, its order was not truly based on that criterion as it applies in the context of this custodial parent's relocation." The Court of Appeal concluded that the superior court "neither proceeded from the presumption that Mother had a right to change the residence of the children, nor took into account this paramount need for stability and continuity in the existing custodial arrangement. Instead, it placed undue emphasis on the detriment that would be caused to the children's relationship with Father if they moved." We granted review.
Shortly after we granted review, the mother filed a notice of abandonment of her appeal, supported by a declaration stating that she no longer intended to move to Ohio, but intended to move to Arizona instead. She asked this court to dismiss the appeal. The father objected. We denied the mother's motion to dismiss the appeal. The mother's counsel later sent to this court a copy of a letter dated July 8, 2003, informing the father that the mother and their children had moved to Arizona. Upon the request of the mother, and without objection by the father, we have taken judicial notice of an order of the superior court filed on August 29, 2003, permitting the children to live with the mother in Arizona "temporarily" pending our ruling in the present proceedings.
*366 Despite the fact that it appears that the mother no longer intends to move to Ohio, the matter under review is not moot. It remains possible that the mother could choose to move to Ohio, and she has changed the residence of the children to Arizona. Accordingly, the issue of whether it is in the children's best interests to modify the custody order if the mother changes the residence of the children is not moot. In any event, we may decline to dismiss a case that has become moot "where the appeal raises issues of continuing public importance. [Citations.]" (Lundquist v. Reusser (1994) 7 Cal.4th 1193, 1202, fn. 8, 31 Cal.Rptr.2d 776, 875 P.2d 1279.) This appeal certainly does.

II. Discussion
In In re Marriage of Burgess, supra, 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473 (Burgess), the mother was awarded temporary sole physical custody of the couple's two children upon the dissolution of their marriage. Seven months later, the mother informed the court that she had accepted a job transfer and planned to move with the children to Lancaster, California, which was about a 40-minute drive from the couple's former home in Tehachapi. She explained that her new job would be "career advancing" and that moving to Lancaster would afford the children greater access to medical care, extracurricular activities, private schools, and day care facilities. The father objected and asked that sole physical custody of the children be transferred to him, contending that he could not maintain his current visitation schedule if the children moved to Lancaster.
The superior court awarded the mother sole physical custody of the children and modified the father's visitation schedule. The court found "`that it is in the best interest of the minor children that the minors be permitted to move to Lancaster with the [mother] and that the [father] be afforded liberal visitation.'" (Burgess, supra, 13 Cal.4th at p. 30, 51 Cal.Rptr.2d 444, 913 P.2d 473.) The father appealed and the Court of Appeal reversed, holding that the mother had failed to sustain her burden of showing that moving the children to Lancaster was "`reasonably necessary.'" (Id. at p. 31, 51 Cal.Rptr.2d 444, 913 P.2d 473.) We granted review and reversed the judgment of the Court of Appeal.
We observed that "[i]n an initial custody determination, the trial court has `the widest discretion to choose a parenting plan that is in the best interest of the child.' (Fam.Code, § 3040, subd.(b).) It must look to all the circumstances bearing on the best interest of the minor child. [Citation.]" (Burgess, supra, 13 Cal.4th at pp. 31-32, 51 Cal.Rptr.2d 444, 913 P.2d 473.) Citing Family Code section 7501, which states that "[a] parent entitled to custody of a child has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child," we noted that the court must also consider "the presumptive right of a custodial parent to change the residence of the minor children, so long as the removal would not be prejudicial to their rights or welfare. [Citation.] Accordingly, in considering all the circumstances affecting the `best interest' of minor children, it may consider any effects of such relocation on their rights or welfare." (Burgess, supra, at p. 32, 51 Cal.Rptr.2d 444, 913 P.2d 473.)
In reviewing the superior court's ruling, we applied "the deferential abuse of discretion test." "The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the `best interest' of the child." (Burgess, supra, 13 Cal.4th at p. 32, 51 *367 Cal.Rptr.2d 444, 913 P.2d 473.) We concluded that the superior court had not abused its discretion. "After extensive testimony from both parents, the trial court not unreasonably concluded that it was in the `best interest' of the minor children that the father and the mother retain joint legal custody and that the mother retain sole physical custody, even if she moved to Lancaster." (Ibid.)
We rejected the Court of Appeal's holding that the mother was required to show that it was "necessary" for her to move to Lancaster: "The trial court must  and here it did  consider, among other factors, the effects of relocation on the `best interest' of the minor children, including the health, safety, and welfare of the children and the nature and amount of contact with both parents. [Citation.] We discern no statutory basis, however, for imposing a specific additional burden of persuasion on either parent to justify a choice of residence as a condition of custody." (Burgess, supra, 13 Cal.4th at p. 34, 51 Cal.Rptr.2d 444, 913 P.2d 473.) We observed that the statutory policy promoting "frequent and continuing contact with both parents" (Fam.Code, § 3020) does not limit "the trial court's broad discretion to determine, in light of all the circumstances, what custody arrangement serves the `best interest' of minor children." (Burgess, supra, 13 Cal.4th at p. 34, 51 Cal.Rptr.2d 444, 913 P.2d 473.) Rather, we noted, Family Code section 3040, subdivision (b), expressly provides the court with "`the widest discretion to choose a parenting plan that is in the best interest of the child.'" (Burgess, supra, at pp. 34-35, 51 Cal.Rptr.2d 444, 913 P.2d 473.)
Although Burgess involved an initial determination of custody, we held that "the same conclusion applies when a parent who has sole physical custody under an existing judicial custody order seeks to relocate: the custodial parent ... bears no burden of demonstrating that the move is `necessary.'" (Burgess, supra, 13 Cal.4th at p. 37, 51 Cal.Rptr.2d 444, 913 P.2d 473.) But we recognized that, as with any allegation that "changed circumstances" warrant a modification of an existing custody order, the noncustodial parent has a substantial burden to show that "`some significant change in circumstances indicates that a different arrangement would be in the child's best interest.' [Citation.]" (Burgess, supra, 13 Cal.4th at p. 38, 51 Cal.Rptr.2d 444, 913 P.2d 473.) The changed circumstance rule provides "that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements. [Citations.]" (Burchard v. Garay (1986) 42 Cal.3d 531, 535, 229 Cal.Rptr. 800, 724 P.2d 486.)[2] "In a `move-away' case, a change of custody is not justified simply because the custodial parent has chosen, for any sound good faith reason, to *368 reside in a different location, but only if, as a result of relocation with that parent, the child will suffer detriment rendering it `"essential or expedient for the welfare of the child that there be a change."' [Citation.]" (Burgess, supra, 13 Cal.4th at p. 38, 51 Cal.Rptr.2d 444, 913 P.2d 473.)
We were quick to emphasize, however, that "bright line rules in this area are inappropriate: each case must be evaluated on its own unique facts. Although the interests of a minor child in the continuity and permanency of custodial placement with the primary caretaker will most often prevail, the trial court, in assessing `prejudice' to the child's welfare as a result of relocating even a distance of 40 or 50 miles, may take into consideration the nature of the child's existing contact with both parents ... and the child's age, community ties, and health and educational needs. Where appropriate, it must also take into account the preferences of the child. [Citation.]" (Burgess, supra, 13 Cal.4th at p. 39, 51 Cal.Rptr.2d 444, 913 P.2d 473.)[3]
Recently, the Legislature codified our decision in Burgess by amending Family Code section 7501 to add subdivision (b), which reads: "It is the intent of the Legislature to affirm the decision in In re Marriage of Burgess (1996) 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473, and to declare that ruling to be the public policy and law of this state." (faM.code, § 7501, as amended bY stats.2003, ch. 674, § 1.)
The Courts of Appeal have applied the rules we stated in Burgess on numerous occasions. In all but two cases (In re Marriage of Williams (2001) 88 Cal.App.4th 808, 105 Cal.Rptr.2d 923 and In re Marriage of Campos (2003) 108 Cal.App.4th 839, 134 Cal.Rptr.2d 300, which are discussed below), the Courts of Appeal have affirmed the superior court's exercise of discretion.
In Cassady v. Signorelli (1996) 49 Cal.App.4th 55, 56 Cal.Rptr.2d 545, the Court of Appeal affirmed an order denying the mother's request to change the residence of the child to Florida so she could seek employment there as a "parapsychologist." The superior court had observed that the mother had no serious job prospects in Florida and that the proposed move "seemed intended simply to frustrate father's relationship with" the child. (Id. at p. 59, 56 Cal.Rptr.2d 545.) The Court of Appeal affirmed, stating: "We find no abuse of discretion.... The trial court could quite properly conclude it was in [the child's] best interests to have continued regular visitation with her father, with whom she has a good relationship, and that a move to Florida would almost entirely frustrate this interest in a continued parental relationship." (Ibid.) Agreeing with the superior court that the mother "simply wishe[d] to get away from father by moving elsewhere" (id. at p. 60, 56 Cal.Rptr.2d 545), the Court of Appeal reiterated that the proposed move was "an apparent pretext to defeat visitation." (Id. at p. 61, 56 Cal.Rptr.2d 545.)
In several cases, the Courts of Appeal have affirmed orders permitting a custodial parent to change the residence of a child. In In re Marriage of Condon (1998) 62 Cal.App.4th 533, 73 Cal.Rptr.2d 33, the *369 superior court permitted the mother to return with the children to Australia where the couple had been married and the children were born. Because the court found the balancing of factors "only slightly favor" permitting the mother to move the children to Australia, the court ruled that it would switch primary physical custody of the children to the father if the mother chose instead to relocate to France where she also had career opportunities. Among the factors considered by the superior court were the mother's ability to financially support herself in Australia rather than be wholly dependent on the father for support; the impact of the parties' stressful relationship on the children; the mother's extensive family in Australia; the children's primary emotional attachment to their mother; and the "children's lack of a firm long-time base in California." (Id. at p. 539, 73 Cal.Rptr.2d 33.) The Court of Appeal affirmed in large part the superior court's order, noting that "[g]reat deference must be given to the trial court's adjudication of the facts" and commending the superior court's "herculean efforts to fairly balance all the factors in the case." (Id. at p. 549, 73 Cal.Rptr.2d 33; see also In re Marriage of Whealon (1997) 53 Cal.App.4th 132, 61 Cal.Rptr.2d 559 [affirming an order permitting the mother to move with her young child to Syracuse, New York to accept a new job].)
In In re Marriage of Edlund & Hales (1998) 66 Cal.App.4th 1454, 78 Cal.Rptr.2d 671, the Court of Appeal affirmed the superior court's order permitting the mother to move with the child to Indiana, stating: "After a thorough review of the record, we are satisfied that the trial court carefully considered all the factors bearing on [the child's] best interest, and that its decision was supported by substantial evidence of the strength and primacy of the bond between [the child] and her mother, [the mother's] proven ability to provide and care for [the child] on a full-time basis, and the overwhelming, undisputed proof that [the father] was not adequately prepared to assume primary physical custody of his daughter." (Id. at p. 1473-1474, 78 Cal.Rptr.2d 671.)
In In re Marriage of Bryant (2001) 91 Cal.App.4th 789, 110 Cal.Rptr.2d 791, the superior court had awarded primary physical custody of the children to the mother, who intended to move to New Mexico, where she had been raised, to be with her family. An evaluation conducted by a court-appointed expert showed that the mother was the "primary parent" and "had a greater level of involvement in the children's lives" than did the father. (Id. at p. 792, 110 Cal.Rptr.2d 791.) The superior court noted that "it would be detrimental to the children to make a `radical shift' to [the father] as the primary parent." (Ibid.) The superior court found that the mother was not motivated to move by bad faith and had not unreasonably interfered with the father's visitation with the children.
The Court of Appeal affirmed, recognizing that the superior court has "`"the widest discretion to choose a parenting plan that is in the best interest of the child."' [Citation.] This requires the court to consider all the circumstances." (In re Marriage of Bryant, supra, 91 Cal.App.4th at p. 793, 110 Cal.Rptr.2d 791.) The Court of Appeal also recognized the difficulty of the decision that faced the superior court: "Unfortunately where, as here, both parents are competent and loving, there is frequently no solution that is fair to everyone involved." (Id. at p. 794, 110 Cal.Rptr.2d 791; In re Marriage of Lasich (2002) 99 Cal.App.4th 702, 121 Cal.Rptr.2d 356 [permitting the mother to return with the children to her native country of Spain]; In re Marriage of Abrams (2003) 105 Cal.App.4th 979, 130 Cal. *370 Rptr.2d 16 [affirming an order permitting the mother to move with the children from Elk Grove, California (near Sacramento) to San Ramon, California (near San Francisco)].)
The difficulty of the task facing the courts in these matters is exemplified by the quandary posed in In re Marriage of Abargil (2003) 106 Cal.App.4th 1294, 131 Cal.Rptr.2d 429, which the Court of Appeal correctly observed would challenge the wisdom of King Solomon. The parents were both Israeli citizens who came to the United States on tourist visas and overstayed. They married and had a son. When they separated, the child lived primarily with the mother and visited the father. The mother returned to Israel to nurse her dying mother, taking the boy with her. While she was in Israel, the father filed for divorce. When the mother attempted to return to California, she was barred from entering the United States for 10 years as a sanction for having overstayed her visa. This sanction was stayed, however, to permit her to return to California to litigate the custody of the child. The father asserted that he would be unable to visit his son if he moved to Israel, because the father was applying for permanent residency in the United States and could not leave the country for an extended time.
Following a five-day trial, the court permitted the child to move to Israel with the mother, noting that she had been the child's primary caregiver and finding that she was more likely to facilitate visitation with the father than if the parental roles were reversed. (In re Marriage of Abargil, supra, 106 Cal.App.4th at p. 1298, 131 Cal.Rptr.2d 429.) The Court of Appeal affirmed, holding that the superior court's finding that moving to Israel with the mother was in the child's best interests was supported by substantial evidence.
In only two cases have the Courts of Appeal reversed the superior court's exercise of discretion, and both cases involved unusual circumstances.
In In re Marriage of Williams, supra, 88 Cal.App.4th 808, 105 Cal.Rptr.2d 923, the superior court permitted two of the couple's four children to move to Utah with their mother, but ordered the other two children to remain in Santa Barbara with their father. This apparent attempt at compromise pleased no one. On appeal by the father, both parents asserted that the superior court abused its discretion. The Court of Appeal agreed, holding that the superior court's order was not supported by "compelling circumstances warranting the separation of the siblings." (Id. at p. 810, 105 Cal.Rptr.2d 923.) The Court of Appeal noted, however: "Had the family law court allowed all of the children to either reside in Santa Barbara or move to Utah, we could easily affirm on the deferential standard of appellate review. [Citation.]" (Id. at p. 813, 105 Cal.Rptr.2d 923.)
The other case in which the Court of Appeal reversed the superior court was In re Marriage of Campos, supra, 108 Cal.App.4th 839, 134 Cal.Rptr.2d 300. The father in that case sought modification of a child custody and visitation order relating to his sons, aged 15 and 12, after their mother announced she would move with the children from Santa Barbara to Moorpark, about two hours away by car. The superior court summarily denied the request, finding that the mother did not have a bad faith reason for the move. The Court of Appeal reversed and remanded the matter for an evidentiary hearing to determine whether the proposed move would be detrimental to the welfare of the children. The Court of Appeal recognized that even when the custodial parent has a good faith reason for the proposed move, *371 "a change of custody may be ordered in a `move away' case where, as a result of the move, the children will suffer detriment rendering a change of custody essential or expedient for their welfare." (Id. at p. 843, 134 Cal.Rptr.2d 300.) "In a move away case, the trial court must always consider whether a custodial parent is acting in bad faith. [Citation.] It must also always consider whether `as a result of relocation with [the custodial] parent, the child will suffer detriment rendering it "`essential or expedient for the welfare of the child that there be a change.'"' [Citation.]" (Id. at p. 844, 134 Cal.Rptr.2d 300.)
The Court of Appeal in the present case held that the superior court abused its discretion in ordering that primary physical custody of the children would be transferred to the father if the mother moved to Ohio. The Court of Appeal concluded that the superior court "neither proceeded from the presumption that Mother had a right to change the residence of the children, nor took into account this paramount need for stability and continuity in the existing custodial arrangement. Instead, it placed undue emphasis on the detriment that would be caused to the children's relationship with Father if they moved." We disagree.
We reaffirm our statement in Burgess that "the paramount need for continuity and stability in custody arrangements  and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker weigh heavily in favor of maintaining ongoing custody arrangements. [Citations.]" (Burgess, supra, 13 Cal.4th at pp. 32-33, 51 Cal.Rptr.2d 444, 913 P.2d 473.) But there is nothing in the record before us that indicates that the superior court failed to consider the children's "interest in stable custodial and emotional ties" with their mother. (Burchard v. Garay, supra, 42 Cal.3d 531, 536, 229 Cal.Rptr. 800, 724 P.2d 486.) The court carefully considered the comprehensive reports prepared by Dr. Stahl and the evidence submitted by both parties. The court placed "primary importance" on the effect the proposed move would have on "what is now a tenuous and somewhat detached relationship with the boys and their father," concluding that the proposed move would be "extremely detrimental" to the children's welfare because it would disrupt the progress being made by the children's therapist in promoting this relationship. The superior court found that it was "realistic" to be concerned that the proposed move could result in the relationship between the father and the children "being lost." In future cases, courts would do well to state on the record that they have considered this interest in stability, but the lack of such a statement does not constitute error and does not indicate that the court failed to properly discharge its duties. (In re Marriage of Arceneaux (1990) 51 Cal.3d 1130, 1133, 275 Cal.Rptr. 797, 800 P.2d 1227 ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness"].)
Contrary to the conclusion of the Court of Appeal, the superior court did not place "undue emphasis" on the detriment to the children's relationship with their father that would be caused by the proposed move. The weight to be accorded to such factors must be left to the court's sound discretion. The Court of Appeal erred in substituting its judgment for that of the superior court.
Noting that the superior court relied on the history of animosity between the parents, and the mother's failure to foster and encourage a healthy relationship between the children and their father, the Court of *372 Appeal quoted the superior court's comment: "`Clearly if the parties had been co-parenting with the children and cooperative in this matter, under those circumstances there might well be a presumptive right' for Mother to relocate with the children." The Court of Appeal concluded that the superior court improperly punished the mother for her past conduct by transferring primary physical custody of the children to their father. We disagree.
The Court of Appeal correctly noted that the superior court's function in determining custody is not to reward or punish the parents for their past conduct, but to determine what is in the best interests of the children. (In re Marriage of Condon, supra, 62 Cal.App.4th 533, 553, 73 Cal.Rptr.2d 33.) But this does not mean that the court may not consider the past conduct of the parents in determining what future arrangement will be best for the children. (See In re Marriage of Abargil, supra, 106 Cal.App.4th 1294, 1299, 131 Cal.Rptr.2d 429 [finding that the mother respected the father's relationship with his son and was likely to foster continuing contact between them, noting her past efforts to nurture that relationship, and contrasting the father's disparagement of the mother's parenting skills]; In re Marriage of Lasich, supra, 99 Cal.App.4th 702, 719, 121 Cal.Rptr.2d 356 [noting that the mother had never tried to block the father from exercising his visitation rights]; In re Marriage of Bryant, supra, 91 Cal.App.4th 789, 792, 110 Cal.Rptr.2d 791 [noting in permitting a change of the child's residence that the mother had not "unreasonably interfered with [the father's] visitation with the children"].) Clearly, the court must consider the past conduct of the parents in fashioning a custody order that serves the best interests of the children.
In the present case, the superior court recognized that "[t]he issue is not whether either of these parents are competent and qualified to be custodial parents.... [¶] The question is whether ... the best interests of the children is served by relocating with Mother to Ohio, or whether the best interests are served by ... a change of physical custody if [the mother] is to relocate." There is nothing in the record before us that indicates the superior court acted out of a desire to punish or reward either parent. But the mother's past conduct indicated that it was unlikely that she would follow through on her promises to encourage the children's relationship with their father if they moved to Ohio. Dr. Stahl testified that "there is no evidence that I've seen in the five years that I've known this family that [the mother] will really do what she said she will do. In terms of being supportive of the boys' relationship with their father in a way that truly will reduce the loyalty conflicts and truly will help them ... feel better about things with him."
The superior court did misspeak, however, in stating that the mother might have had a presumptive right to relocate with the children if the parents had co-parented cooperatively. The mother  as the parent with primary physical custody of the children  had a presumptive right to change the children's residence unless the proposed move "would result in `prejudice' to [the children's] `rights or welfare.' [Citation.]" (Burgess, supra, 13 Cal.4th at p. 38, 51 Cal.Rptr.2d 444, 913 P.2d 473.) But we are convinced, after examining the entire record, that the court's imperfect choice of words in this single regard does not indicate that the court misperceived the standard for determining the question before it. The court was correct that the situation might have been far different had the parents shown a history of cooperative parenting. If that had been the case, it *373 might have appeared more likely that the detrimental effects of the proposed move on the children's relationship with their father could have been ameliorated by the mother's efforts to foster and encourage frequent, positive contact between the children and their father. But the court reasonably concluded that the present case presented the opposite situation. The parents' history of animosity and the mother's consistent attempts to limit contact between the children and their father indicated that the proposed move would be detrimental to the children. Essentially, the court concluded that the mother's past conduct made it unlikely that she would facilitate the difficult task of maintaining the father's long-distance relationship with the boys.
The Court of Appeal was concerned about the superior court's reliance upon the detriment to the children's relationship with their father that would be caused by the proposed move, because "[t]here is inevitably a significant detriment to the relationship between the child and the noncustodial parent" whenever the custodial parent relocates with the children. The Court of Appeal observed that "if evidence of some detriment due to geographical separation were to mandate a change of custody, the primary custodial parent would never be able to relocate." We agree. We do not suggest that a showing that a proposed move will cause detriment to the relationship between the children and the noncustodial parent mandates a change in custody. But it is within the wide discretion of the superior court to order a change of custody based upon such detriment, if such a change is in the best interests of the children in light of all the relevant factors.
It is instructive to compare the present case to In re Marriage of Edlund & Hales, supra, 66 Cal.App.4th 1454, 78 Cal.Rptr.2d 671, which involved similar circumstances. The mother in Edlund wished to move with her child to another state where her fiance had accepted a job and was already living and where they would have a lower cost of living, allowing her to stay at home with her children rather than working full time outside the home. A mediator found that" `the mother does not appear to have negative motives for the move, i.e., [to] frustrate contact between the father and the child'" (id. at p. 1459, 78 Cal.Rptr.2d 671) and an evaluator opined that the mother "was sincere about her reasons for moving" (id. at p. 1462, 78 Cal.Rptr.2d 671). Significantly, the court relied upon the evaluator's opinion that the mother had not attempted to limit the father's visitation in the past, noting that the mother" `did not express any anger or upset'" with the father and" `acknowledged the importance of his role as Natalie's father. She endorsed their relationship and believes it is paramount for them to continue to have a strong bond. There is no evidence that [the mother] has frustrated or endeavored to limit or prohibit [the father's] custodial time with Natalie in the past.'" (Ibid.) Finally, the evaluator noted that the father "`would experience great difficulty'" if he were given primary physical custody of the child. (Id. at p. 1463, 78 Cal.Rptr.2d 671.) Although the superior court questioned the mother's judgment, it permitted the mother to change the residence of the child.
The Court of Appeal in Edlund affirmed, concluding that the superior court had not abused its discretion: "After a thorough review of the record, we are satisfied that the trial court carefully considered all the factors bearing on Natalie's best interest, and that its decision was supported by substantial evidence of the strength and primacy of the bond between Natalie and her mother, [the mother's] *374 proven ability to provide and care for Natalie on a full-time basis, and the overwhelming, undisputed proof that [the father] was not adequately prepared to assume primary physical custody of his daughter. Thus, we conclude the trial court did not abuse its discretion by issuing a move-away order in the circumstances of this case." (In re Marriage of Edlund & Hales, supra, 66 Cal.App.4th 1454, 1473-1474, 78 Cal.Rptr.2d 671.)
The Edlund court considered the detriment to the child's relationship with her father that was likely to result from the move, but correctly concluded that, under the circumstances of that case, this was insufficient to alter its holding: "we cannot imagine a case in which a child with any meaningful relationship with the noncustodial parent would not be `significantly negatively impacted' by a good faith decision by a custodial parent to move, over the noncustodial parent's objection, to a distant location. But if the evidence of `detriment' contained in [the evaluator's] report were sufficient to support denial of a move-away order in this case, no primary custodial parent would ever be able to secure such an order." (In re Marriage of Edlund & Hales, supra, 66 Cal.App.4th at p. 1472, 78 Cal.Rptr.2d 671.)
We agree that, considering all of the circumstances in Edlund, the superior court in that case did not abuse its discretion in permitting the change in the child's residence, but the Court of Appeal in Edlund may have inadvertently generated some confusion when it stated as a general conclusion: "The showing of `changed circumstances' required of the noncustodial parent must consist of more than the fact of the proposed move." (In re Marriage of Edlund & Hales, supra, 66 Cal.App.4th at p. 1469, 78 Cal.Rptr.2d 671.) If we interpret this statement narrowly, it certainly is true. The mere fact that the custodial parent proposes to change the residence of the child does not automatically constitute "changed circumstances" that require a reevaluation of an existing custody order. A proposed change in the residence of a child can run the gamut from a move across the street to a relocation to another continent. As we have noted, the noncustodial parent has the burden of showing that the planned move will cause detriment to the child in order for the court to reevaluate an existing custody order.
But some courts have mistakenly interpreted the above quoted statement in Edlund more broadly to mean that the likely consequences of a proposed move can never constitute changed circumstances that justify a reevaluation of an existing custody order. (In re Marriage of Abrams, supra, 105 Cal.App.4th 979, 988, 130 Cal.Rptr.2d 16 ["it is not enough to show the child has a meaningful relationship with the noncustodial parent and will be `negatively impacted' by the custodial parent's good faith decision to move. If this were sufficient to support denial of a move-away order, no primary custodial parent would ever be able to secure such an order"]; In re Marriage of Lasich, supra, 99 Cal.App.4th 702, 711, 121 Cal.Rptr.2d 356 ["[affirming the trial court's ruling that "[r]elocation alone cannot prove detriment because no move-away request could succeed under that standard," citing In re Marriage of Edlund & Hales, supra, 66 Cal.App.4th 1454, 78 Cal.Rptr.2d 671].) This is incorrect. The likely consequences of a proposed change in the residence of a child, when considered in the light of all the relevant factors, may constitute a change of circumstances that warrants a change in custody, and the detriment to the child's relationship with the noncustodial parent that will be caused by the proposed move, when considered in light of all the relevant factors, may warrant denying *375 a request to change the child's residence or changing custody. The extent to which a proposed move will detrimentally impact a child varies greatly depending upon the circumstances. We will generally leave it to the superior court to assess that impact in light of the other relevant factors in determining what is in the best interests of the child.
The Court of Appeal in the present case held that the father bore the burden of showing "that modification of custody is essential for the child's welfare," citing our statement in Burgess that a change of custody in a move-away case is justified "only if, as a result of relocation with that parent, the child will suffer detriment rendering it `"essential or expedient for the welfare of the child that there be a change."' [Citation.]" (Burgess, supra, 13 Cal.4th 25, 38, 51 Cal.Rptr.2d 444, 913 P.2d 473.) It is significant that the Court of Appeal reduced the phrase "essential or expedient" that we used in Burgess to simply "essential." In doing so, the Court of Appeal placed too great a burden on the noncustodial parent in a move-away case.
The phrase "essential or expedient" in Burgess derives from the opinion in Washburn v. Washburn (1942) 49 Cal.App.2d 581, 587, 122 P.2d 96, which held that a change of custody could be ordered only "where adequate cause therefore arises out of changed conditions." The Washburn court stated: "Generally speaking, there may be no change in the custody provisions of a decree unless the material facts and circumstances occurring subsequently are of a kind to render it essential or expedient for the welfare of the child that there be a change." (Id. at p. 588, 122 P.2d 96.) The court further noted that "[i]n custody cases the underlying principle, paramount to all others, is the welfare and best interests of the child" (id. at p. 587, 122 P.2d 96) and "each case must be solved on its own facts." (Id. at p. 588, 122 P.2d 96.) Neither Washburn nor Burgess imposes upon the noncustodial parent an artificial requirement to prove that a change in custody is "essential." Both cases recognize that the paramount concern is the welfare and best interests of the child. A change in custody is "essential or expedient" within the meaning of Burgess, therefore, if it is in the best interests of the child.
The Court of Appeal in the present case further concluded that the superior court improperly used its conditional order transferring primary physical custody to the father as a device to restrain the mother from relocating. We agree that a court must not issue such a conditional order for the purpose of coercing the custodial parent into abandoning plans to relocate. Nor should a court issue such an order expecting that the order will not take effect because the custodial parent will choose not to relocate rather than lose primary physical custody of the children. But there is nothing in the record before us that indicates the superior court did so in the present case. The father had long sought joint physical custody or, barring that, increased visitation, and the superior court had slowly but consistently increased the time the children spent at their father's residence. The court found that both parties were "good enough" parents to their children. There is nothing to indicate that the order transferring primary physical custody of the children to the father if the mother relocated was issued to coerce the mother into abandoning her plans to move.
The mother places great emphasis on the superior court's finding that she was not acting in "bad faith." The father contends that the "bad faith test" announced in Burgess"is generally unworkable." We discussed good faith and bad faith in two footnotes in our opinion in Burgess.
*376 In rejecting the argument that a parent who wishes to change the residence of a child bears the burden of proving the move is "necessary," we noted that such a rule would encourage costly litigation and would "require the trial courts to `micromanage' family decisionmaking by second-guessing reasons for everyday decisions about career and family." (Burgess, supra, 13 Cal.4th at p. 36, 51 Cal.Rptr.2d 444, 913 P.2d 473.) In a footnote, we observed that "the parties continue to dispute whether the mother's change of employment was merely a `lateral' move or was `career enhancing.' The point is immaterial. Once the trial court determined that the mother did not relocate in order to frustrate the father's contact with the minor children, but did so for sound `good faith' reasons, it was not required to inquire further into the wisdom of her inherently subjective decisionmaking." (Id. at p. 36, fn. 5, 51 Cal.Rptr.2d 444, 913 P.2d 473.)
We then stated that a decision to change a child's residence ordinarily does not reflect upon the parent's suitability to retain primary physical custody. We pointed out in another footnote, however: "An obvious exception is a custodial parent's decision to relocate simply to frustrate the noncustodial parent's contact with the minor children.... Even if the custodial parent is otherwise `fit,' such bad faith conduct may be relevant to a determination of what permanent custody arrangement is in the minor children's best interest. [Citations.]" (Burgess, supra, 13 Cal.4th at p. 36, fn. 6, 51 Cal.Rptr.2d 444, 913 P.2d 473.)
We referenced these discussions of good faith and bad faith in our formulation of the rule: "In a `move-away' case, a change of custody is not justified simply because the custodial parent has chosen, for any sound good faith reason, to reside in a different location, but only if, as a result of relocation with that parent, the child will suffer detriment rendering it `"essential or expedient for the welfare of the child that there be a change."'" (Burgess, supra, 13 Cal.4th at p. 38, 51 Cal.Rptr.2d 444, 913 P.2d 473.)
The Courts of Appeal have correctly applied these rules, but in one published decision the Court of Appeal overstated the importance of an absence of bad faith.
In In re Marriage of Bryant, supra, 91 Cal.App.4th 789, 110 Cal.Rptr.2d 791, the superior court awarded primary physical custody to the mother who intended to move with the children to New Mexico to be with her family. A custody evaluation revealed that the mother had been the "primary parent," having had "a greater level of involvement in the children's lives" than the father and that it would be "detrimental to the children to make a `radical shift' to [the father] as the primary parent." (Id. at p. 792, 110 Cal.Rptr.2d 791.) The evaluator saw no reason to believe that the move would end the children's relationship with their father. The superior court found that the mother "was not motivated to move by bad faith" and had not "unreasonably interfered with [the father's] visitation with the children." (Ibid.)
The Court of Appeal affirmed, correctly noting that "the trial court has `"the widest discretion to choose a parenting plan that is in the best interest of the child."' [Citation.] This requires the court to consider all the circumstances." (In re Marriage of Bryant, supra, 91 Cal.App.4th 789, 793, 110 Cal.Rptr.2d 791.) But the Court of Appeal went on to overstate the importance of the superior court's finding that the mother was not acting in bad faith, holding that that once the superior court found that the mother was not acting in bad faith, "[n]o further inquiry [into the reasons for the proposed move] was necessary *377 or appropriate." (Id. at p. 794, 110 Cal.Rptr.2d 791.) Rejecting the father's contention that the court should "consider the reason for the move in light of the circumstances of the case," the Court of Appeal stated: "except to show that the move is not in bad faith, the reason is irrelevant." (Id. at p. 795, 110 Cal.Rptr.2d 791.)[4]
This is not what we said in Burgess; we said simply that a finding that a reason for the proposed move constitutes bad faith "may be relevant" in determining custody arrangements. (Burgess, supra, 13 Cal.4th at p. 36, fn. 6, 51 Cal.Rptr.2d 444, 913 P.2d 473.) While we noted that the court need not evaluate the wisdom of the custodial parent's decisionmaking (id. at p. 36, 51 Cal.Rptr.2d 444, 913 P.2d 473, fn. 5), we did not say that the reasons for a proposed move are irrelevant if the custodial parent is acting in good faith.
Absolute concepts of good faith versus bad faith often are difficult to apply because human beings may act for a complex variety of sometimes conflicting motives. As the superior court in the present case observed after finding that the mother was not acting in bad faith because she had legitimate reasons for the move and was not acting for the specific purpose of limiting the father's contact with his children: "I think it's far more subtle than that...." As Dr. Stahl stated in his evaluation: "On the surface, the reasons for the move are clear. [The mother] has always wanted to move to Ohio to be closer to her sister and family.... [Her husband] has received a good job opportunity in Cleveland, which he has taken. Their economic standard of living, and the inherent quality of life, will improve under such circumstances. All of these are reasonable reasons to make the move.[¶] Underneath, however, it has always appeared that [the mother] has wanted to move so that she can remove herself and take the boys from the day-to-day interactions with [the father]. She has difficulty dealing with him and prefers to have as little communication with him as possible."
Even if the custodial parent has legitimate reasons for the proposed change in the child's residence and is not acting simply to frustrate the noncustodial parent's contact with the child, the court still may consider whether one reason for the move is to lessen the child's contact with the noncustodial parent and whether that indicates, when considered in light of all the relevant factors, that a change in custody would be in the child's best interests.[5]
The foregoing cases, many of which involve heart-wrenching circumstances, remind us that this area of law is not amenable to inflexible rules. Rather, we must permit our superior court *378 judges  guided by statute and the principles we announced in Burgess and affirm in the present case  to exercise their discretion to fashion orders that best serve the interests of the children in the cases before them. Among the factors that the court ordinarily should consider when deciding whether to modify a custody order in light of the custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody.

III. Disposition
The judgment of the Court of Appeal is reversed and the matter is remanded to that court with directions to affirm the superior court's postjudgment order transferring custody of the children to the father if the mother moves to Ohio. On remand, the superior court should consider the views expressed in this opinion and may consider the parties' present circumstances in issuing any further custody and visitation order.
WE CONCUR: GEORGE, C.J., BAXTER, WERDEGAR, CHIN and BROWN, JJ.
Dissenting Opinion by KENNARD, J.
A mother who had been the primary caretaker of her two children since their birth, and who had never violated the trial court's visitation orders, wanted to provide a better life for her children by moving with them to another state where she had relatives and where her new husband had accepted a better paying job. Concerned that his tenuous relationship with the children would be weakened, the children's father objected. After a hearing, the trial court ordered that custody of the children be transferred to the father in the event the mother moved. The majority holds the trial court did not abuse its discretion in so ruling. I disagree.
When it explained its ruling, the trial court said that moving the children to another state could damage the children's relationship with their father, but the court never mentioned the potential harm to the children from losing their mother as their primary caretaker, despite undisputed evidence that this harm would be significant. The majority acknowledges that the trial court was required to consider this detriment  indeed it acknowledges "`the paramount need for continuity and stability in custody arrangements'" (maj. opn., ante, 12 Cal.Rptr.3d at 371, 88 P.3d at p. 94, italics added)  but it assumes the trial court adequately considered this point.
In a matter of this importance, involving the custody and welfare of minor children, a reviewing court should not make such a speculative assumption. When a trial court's explanation for exercising its discretion in a particular way does not mention a critical matter that the court was bound to consider, and does not accurately state the controlling legal standard, a reviewing court cannot simply ignore these omissions. When, as here, the appellate record raises substantial doubts that the trial court applied the proper legal principles and policies that should have guided its decision, reversal is required.

*379 I
In May 1996, Susan Navarro (the mother) petitioned the superior court to dissolve her marriage to Gary LaMusga (the father) and to obtain custody of their two young children. The father requested joint legal and physical custody. Pending final determination of the custody issue, the children remained in the family home with the mother, and the father established his own separate residence. The court appointed Philip Stahl, Ph.D., a psychologist, to conduct a custody evaluation. Pending this evaluation, the parties agreed to a visitation schedule for the father.
During the initial custody evaluation, the mother told Stahl she wanted to move with the children to Ohio, where she had grown up, to be closer to her relatives and to take advantage of a lower cost of living. Stahl advised against the move because of the children's ages (then four and two) and their need to establish a stronger relationship with their father before relocating. Accepting this recommendation, the mother voluntarily postponed her plans.
In December 1996, the trial court awarded primary physical custody to the mother, with continued visitation for the father. Over the next four years, the mother obeyed all court orders for visitation and frequently stipulated to increases in the father's visitation time with the children. During this time, both parties remarried. The mother married Todd Navarro and they had a daughter, Aisley. The father's new wife had a daughter from her previous marriage.
In April 1999, the mother and the father stipulated to a second evaluation by Stahl to determine how the children were doing, whether any change in the custody timeshare was appropriate, and whether counseling for the children or the parties was indicated. Stahl's report, submitted in February 2001, expressed the view that although the children had a good relationship with the mother, their primary caretaker, they did not get along well with the father. In Stahl's opinion, the children's difficulties with the father were partly the mother's fault. Although she was not intentionally subverting the relationship, Stahl thought the mother was unconsciously contributing to the children's alienation from their father by telling them too much about her disputes with the father and by overindulging them when they expressed negative emotions about the father. Stahl also placed part of the blame on the father, observing that he "is somewhat self-centered and doesn't seem to deal with the boys' feelings that well" and that "he is a bit detached from them and has a hard time interacting with them when they are with him, even though he tries reasonably well."
To remedy this situation, Stahl suggested having the children spend fewer but longer blocks of time with their father during the school year, and equal blocks of time during holidays and during the summer. He also recommended that all disputes be referred to mediation "so that [the parents] can learn problem solving skills and learn to deal with disputes away from their children," and so that they "learn to disengage from their conflict by trying to parallel parent the boys." He explained: "With parallel parenting, each parent will strive to do the best job of parenting the boys during the time they are in their respective care, and relinquish the boys to the other parent during the time they are in the other parent's care."
In February 2001, the mother requested a modification of the custody order by allowing her to relocate with the boys to Ohio, where her new husband had obtained a better paying job. In March 2001, the trial court ordered a focused evaluation on the mother's relocation request from Stahl. *380 In a supplemental report, submitted in June 2001, Stahl noted that if the mother moved with the children to Ohio, "[t]heir economic standard of living, and the inherent quality of life, will improve...." He also acknowledged that ordering a custody change to the father would have a significant detrimental effect on the children: "They have been in the primary care of their mother since their parents' divorce and they will likely have a significant loss [if] she moves without them. They also have a very close relationship with their sister, Aisley, as well as with Todd, and they will feel those losses as well. Third, they certainly have their own desire to move.... If they don't move, they're likely to feel that their wishes aren't being heard.... On top of that, they're likely to blame their dad, potentially increasing their rejection of their dad if forced to stay in California." Stahl also expressed concern, however, that a move to Ohio could further weaken the children's relationship with the father. Stahl characterized this relationship as "tenuous at best."
At an August 2001 hearing, the trial court denied the mother's request to have her sons move with her, and it ordered a transfer of custody to the father if the mother relocated. The court said it was making this order "to reinforce what is now a tenuous and somewhat detached relationship with the boys and their father." In explaining its ruling, the court never mentioned the detriment that the boys were likely to suffer in the event of a custody change from the mother to the father.
The Court of Appeal reversed, holding that the trial court had erred by not considering the detriment to the children that would result from a change in custody.
This court granted review.

II
A parent with custody of minor children has a "presumptive right" to change the children's residence. (In re Marriage of Burgess (1996) 13 Cal.4th 25, 32, 38, 51 Cal.Rptr.2d 444, 913 P.2d 473; see also Fam.Code, § 7501.) A noncustodial parent opposing such a change of residence bears the initial burden of showing that the move will cause some detriment to the children. (In re Marriage of Burgess, supra, at p. 37, 51 Cal.Rptr.2d 444, 913 P.2d 473.) Once this showing of detriment has been made, the trial court must then weigh the likely effects on the child's welfare from moving with the custodial parent, against the likely effects from a change in custody. (Id. at pp. 38-39, 51 Cal.Rptr.2d 444, 913 P.2d 473.) Only if the child's interests are better served by changing custody than by relocating with the custodial parent may a court order custody transferred to the other parent. (Ibid.)
Here, the trial court's explanation for its ruling shows that it properly considered how relocation to Ohio might detrimentally affect the children  including the impact on their tenuous relationship with their father. But the trial court was also required to weigh this detriment against the detriment that would result from removing the boys from the mother's custody. This the court did not do. In its statement of reasons, the court said: "So I don't think that I have any real question as to the qualifications or competence of either parent, that is not the issue before me. The issue is the effect on these children of relocating, and the effect of the relationship with their father if they are permitted to relocate." (Italics added.) But the effect of the relocation on the children's relationship with the father was not the issue before the court. Rather, it was just one of the potential detriments shown by the evidence that the trial court was required *381 to consider. Equally important was the potential detriment from disrupting the existing custodial arrangement by transferring custody from the mother to the father.
This court has stressed that the "the paramount need for continuity and stability in custody arrangements  and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker  weigh heavily in favor of maintaining ongoing custody arrangements." (In re Marriage of Burgess, supra, 13 Cal.4th at pp. 32-33, 51 Cal.Rptr.2d 444, 913 P.2d 473.) Here, the trial court's explanation for its ruling provides no assurance that the trial court gave any weight to the importance of continuity and stability in custody arrangements.
The trial court's ruling on this custody issue is reviewed for abuse of discretion. (In re Marriage of Burgess, supra, 13 Cal.4th at p. 32, 51 Cal.Rptr.2d 444, 913 P.2d 473) "The courts have never ascribed to judicial discretion a potential without restraint." (People v. Russel (1968) 69 Cal.2d 187, 194, 70 Cal.Rptr. 210, 443 P.2d 794.) Rather, "all exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." (Id. at p. 195, 70 Cal.Rptr. 210, 443 P.2d 794; accord, People v. Superior Court (Alvarez) (1997) 14 Cal.4th 968, 977, 60 Cal.Rptr.2d 93, 928 P.2d 1171.) Thus, a trial court abuses its discretion whenever it applies the wrong legal standard to the issue at hand. (Linder v. Thrifty Oil Co. (2000) 23 Cal.4th 429, 435-436, 97 Cal.Rptr.2d 179, 2 P.3d 27 [a discretionary order based upon improper criteria or incorrect assumptions must be reversed]; In re Carmaleta B. (1978) 21 Cal.3d 482, 496, 146 Cal.Rptr. 623, 579 P.2d 514 ["discretion can only be truly exercised if there is no misconception by the trial court as to the legal basis for its action"].) It follows that a reviewing court must examine the trial court's stated reasons for an exercise of discretion to determine whether those reasons reflect a correct understanding of the relevant legal standards and principles. (See, e.g., Linder v. Thrifty Oil Co., supra, 23 Cal.4th 429, 97 Cal.Rptr.2d 179, 2 P.3d 27.)
Concluding that the trial court did not abuse its discretion, the majority says that "nothing in the record before us indicates that the superior court failed to consider the children's `interest in stable custodial and emotional ties' with their mother." (Maj. opn., ante, 12 Cal.Rptr.3d at p. 371. 88 P.3d at p. 94.) But it is equally true that nothing in the record indicates that the court did consider this interest. The majority goes on to state, "In future cases, courts would do well to state on the record that they have considered this interest in stability, but the lack of such statement does not constitute error and does not indicate that the court failed to properly discharge its duties." (Maj. opn., ante, 12 Cal.Rptr.3d at p. 371. 88 P.3d at p. 94.) I disagree. In the absence of such a statement, or some other evidence in the record showing that the trial court affirmatively considered and weighed the required factors, I cannot conclude that the trial court properly exercised its discretion.

III
Like the Court of Appeal, I conclude in this case that "[t]he [trial] court's remarks do not reflect a true `best interest' of the child custody evaluation because they do not give any weight to the presumption favoring continuation of the existing custodial arrangement so that the stability and continuity of the child's environment is not disrupted." Therefore, I would affirm the *382 judgment of the Court of Appeal reversing and remanding to the trial court.
NOTES
[*] Kennard, J., dissented.
[1] The provisions in the Family Code governing custody of children do not use the term "primary physical custody." (In re Marriage of Richardson (2002) 102 Cal.App.4th 941, 945, fn. 2, 126 Cal.Rptr.2d 45.) Rather, the code uses the terms "joint physical custody," which "means that each of the parents shall have significant periods of physical custody" (Fam.Code, § 3004), and "sole physical custody," which "means that a child shall reside with and be under the supervision of one parent, subject to the power of the court to order visitation" (Fam.Code, § 3007). The term "primary physical custody" does appear in Family Code section 4045, subdivision (d)(3), which grants the Judicial Council the authority to review the statewide uniform child support guidelines.
[2] In his reply brief, the father argues that the changed circumstance rule does not apply in this case because there has not been "a final judicial custody determination." We do not agree. The court's December 23, 1996 "Order After Hearing," granting joint legal custody to the parties and sole primary physical custody to the mother, constituted a final judicial custody determination that the court need not reconsider in the absence of changed circumstances. Our holding in Montenegro v. Diaz (2001) 26 Cal.4th 249, 109 Cal.Rptr.2d 575, 27 P.3d 289, cited by the father, involved a stipulated custody order, rather than an order following a hearing as in the present case, and does not alter our conclusion.
[3] We noted that "[a] different analysis may be required when parents share joint physical custody of the minor children under an existing order and in fact, and one parent seeks to relocate with the minor children." (Burgess, supra, 13 Cal.4th at p. 40, fn. 12, 51 Cal.Rptr.2d 444, 913 P.2d 473.) In such cases, if it is shown that the best interests of the children require modification or termination of the order, the court "must determine de novo what arrangement for primary custody is in the best interest of the minor children." (Ibid.)
[4] In Cassady v. Signorelli, supra, 49 Cal.App.4th 55, 56 Cal.Rptr.2d 545, the Court of Appeal commented on the wisdom of the mother's proposal to move with her child to Florida to pursue a career as a parapsychologist, referring to the "mother's somewhat whimsical plans," but it is clear from a full reading of the opinion that the appellate court affirmed the superior court's denial of the mother's request to move the child's residence because it agreed that the mother was not seriously seeking employment as a parapsychologist and "simply wishe[d] to get away from father by moving elsewhere." (Id. at p. 60, 56 Cal.Rptr.2d 545.) Although the Court of Appeal did not use the term "bad faith," it concluded that the mother's proposed move was "an apparent pretext to defeat visitation." (Id. at p. 61, 56 Cal.Rptr.2d 545.)
[5] We have no occasion in this case to consider circumstances in which a reason for a proposed move is to minimize contact with a noncustodial parent who has engaged in a pattern of abuse of the custodial parent or the children or who has a substance abuse problem.