Filed 8/29/22  Marriage of Rodgers CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In the Marriage of SOLOMON RODGERS and YVONNE M. RODGERS. | |
| SOLOMON RODGERS, Respondent, v. YVONNE M. RODGERS, Appellant. | D079456 (Super. Ct. No. DN178794) |

APPEAL from an order of the Superior Court of San Diego County, Matthew Brower, Judge.  Reversed.

The Appellate Law Firm and Berangere Allen-Blaine for Appellant.

Goldberg Jones and Siobhan H. Curley for Respondent.

Yvonne M. Rodgers (Mother) appeals a change of custody order granting Solomon Rodgers, Jr., (Father) physical custody of their two younger children, L.R. and A.R.  She contends the court abused its discretion by engaging in an analysis of the best interests of the children without first

finding a substantial change in circumstances that made it essential to the welfare of the children to change the custody arrangement. We agree, and we accordingly reverse.

FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father share three children, S.R., L.R., and A.R., who were 16, 12, and 8 years old respectively at the time of the hearing. An October 29, 2018 custody order granted parents joint legal custody and granted physical custody of S.R. to Father and physical custody of L.R. and A.R. to Mother. Father had visitation with L.R. and A.R. on the first, third, and any fifth weekend from Friday night to Sunday night. Father also had visitation for half of summer, alternating holidays, and two weeks of vacation each year.

On May 5, 2021, Father filed a request for order to change the custody arrangement so that he would have physical custody of L.R. and A.R., and his child support payment would be reduced.[1] Other than the proposed visitation for Mother on the second and fourth weekends of each month, half the summer, alternating holidays, and two weeks of vacation, he asked for the children to remain in his care at all times.

In his supporting declaration, Father explained L.R. told him in February 2021 that she was under stress from playing a "parental role" at Mother's house; she was expected to get ready for school and also help her sibling A.R. log into Zoom and assist with his day-to-day activities. Father reported that L.R. told him there was lack of structure in Mother's home, giving as an example that they must take their clothes from a clean pile of laundry in their room until the pile is gone. Father also explained that L.R.'s

---

[1] Father's request does not seek a move-away order or seek any changes to custody of S.R.

grades suffered; and she was earning F's in English and in literature, D's in math and science, and a zero credit in physical education.[2] L.R. had a total of 69 absences from seven classes,[3] which Father asserted demonstrated a lack of educational and emotional support under Mother's care.

Father reported that A.R. has an Individualized Education Plan (IEP). Mother said A.R. was diagnosed with a learning disability and potentially autism but refused to share those records with Father when requested.

Father told the court there had been multiple reports to child welfare services regarding the quality of Mother's care of children, but he declined to provide any details and asked the court to subpoena the records.

Father also said he was concerned about Mother's mental well-being because of statements she made to him, such as, "My kids are my oxygen."

In his declaration, Father contrasted Mother's parenting with his own. He facilitates L.R.'s monthly orthodontic appointments. When Mother failed to take A.R. for a needed hearing test or to purchase eye-glasses for the children, he handled those needs. Father further detailed his involvement in L.R.'s education, explaining he communicates directly with her teachers and helps her catch up on schoolwork to help improve her grades.

The custody dispute came for hearing on August 10, 2021. The court heard testimony from Father, Mother, and S.R., as well as Mother's friend,

---

[2] It is unclear whether the court considered the documentary evidence attached to the petition. The court told the parties there were no exhibits formally admitted, so it was strictly limiting the evidence to the testimony of the witnesses it heard. The records for L.R.'s grades are an undated print-out from the internet and that the progress grades for physical education and science differ in appearance from the other subjects.

[3] The record shows 18 absences in journalism, 12 absences in English, 12 absences in science and physical education, and five absences each in math, literature, and social studies.

Richard Lovato, Jr. Father's testimony was consistent with the information he provided in declarations, including his descriptions of his involvement in the children's medical and orthodontic care. He was motivated to seek a change in custody because L.R. was asking to live with him, but Mother would not let her. He believed L.R. wanted to live with him because Mother's living space is smaller and L.R. shares a room with an older sister, does her own laundry unsupervised, and has clothes in the middle of the floor. He believed there was no help with homework and L.R. had to help care for her younger brother; she just did not want to live with Mother.

Father also testified that his home was big enough for all the children to have their own rooms; L.R. would be able to start gymnastics and A.R. would be able to start baseball, and he and his wife would help their children with their education. He already was helping L.R. with homework on the weekends, which they would scan to submit to teachers. He described himself as structured and rigid, with set bedtimes and supervision, in contrast to Mother's style, which is "very loose" because she has her own schoolwork to do and she tries to be "their friend." He noted that Mother struggles financially; Father buys the children clothes and takes care of their medical needs. He admitted these same concerns had been ongoing since 2012.

When pressed, Father told the court he wanted the change in custody so that he could work more closely on their educational needs and their mental health, but also because financially he could support them; clothing is always an issue, and he would provide more supervision. He said, "Just overall in general[,] their wellbeing. But education[ ] and their healthcare [are] my . . . reasons."

Father knew A.R. had an IEP, but he could not remember how many IEP meetings he attended since 2017, if any. He testified he was not sure if he was ever made aware of those meetings.

Mother testified that Father's contact information was on all school records. She tried to secure therapy for L.R. during the pendency of the divorce, but Father refused the therapists she selected. A.R. receives services through the Regional Center, packaged with his IEP, focusing on speech, fine motor skills, and social interactions.

Mother blamed Father for losing her job because he refused to watch the children while she underwent training for work. Before the divorce was final, father stopped paying her rent and she was evicted, so she lived in her car for a year and a half with the children. She also spent some time living with her mother-in-law and her sister.[4]

She also explained she had been furloughed from YMCA for about a year and a half because of COVID. Before that job, in which she worked doing in-home respite care, she was a military youth counselor. The YMCA terminated her employment two months before the hearing. She believed Father was seeking custody of the children because he had just bought a home in Temecula and he did not want to pay as much in child support.

Mother testified that L.R. was doing average to very well in school until COVID. Because she and Father sometimes split weeks over holiday weeks, sometimes when L.R. was with him, she was not doing homework, and she fell behind. Mother asked Father to make sure he would help L.R. with homework.

---

[4] These events all predated the final custody order. Mother's living arrangements stabilized by 2015.

Mother had ensured A.R. was getting services since he was about three years old; she enrolled A.R. in after school programs with art shows and field trips and other social activities. She also had a nanny who worked with A.R. She attended all of A.R.'s IEP meetings and secured A.R. an In-Home Supportive Services (IHSS) program approval.

During COVID, they shared the children every other week for a particular month, and in November, Father kept the children for a couple weeks, but other than that, L.R. and A.R. were with Mother.

Mother felt that Father used his financial status to sway the children by telling them he would provide them with their own rooms, all the toys they wanted, a pool to play in, and travel to other countries.

Mother told the court she loved her children passionately, and she said, "my children are my heart," and "[t]hey are my oxygen because I love them." Mother admitted she said Father was trying to kill her when he brought the custody motion, but she meant he was causing her anxiety, and she made the comment metaphorically.

S.R. testified that after his father took custody, he attended New Mexico Military Institute, where he did not perform well. Then he transferred to Escondido Charter High School for his ninth and tenth grade years. He did pretty well there academically, which he attributed to the flexibility of the program because he could choose which days to attend in person as well as the pace of the work and overall workload. He said Father makes sure he completes his homework, and Mother also tries to make sure he keeps his grades up by checking grades and the work he submits.

He would prefer to live with his Mother because of the convenience of being near schools, and because he prefers her neighborhood and likes being with his siblings. He said he dislikes some of the structure at his father's

house, like waking up at the same time each day no matter what, and working during the same times every day, even on days off. He said he thinks his parents could do better at communication and not arguing.

Richard Lovato, Jr., testified regarding his observations of the parents' exchanges of the children. He also testified that he saw A.R. upset with Father for cutting his hair, noting that any drastic change can "set off" a child with autism.

Following arguments by the attorneys, the court addressed the factors outlined in *In re Marriage of Burgess*[5] and *Marriage of LaMusga*[6] because Father planned to move the children out of the county. When it addressed the seventh *Burgess* factor, the court turned to the reason for the proposed move: "The father is proposing this move so that the children could have their educational needs more fully addressed." The court also referenced the need for clothing and L.R.'s mental health. It concluded the eight factors that go toward a move-away were supported. Then it went through the four *LaMusga* factors. It concluded it would grant the move-away request. It wanted to keep the siblings together.

The court ordered the parents to share legal custody. It awarded Father primary legal custody to select the children's school location in the event of a disagreement between him and Mother and stated, "Once that school location is decided the mother has coequal legal custody rights . . . ."

The written order provides that "[t]he children shall primarily reside with the father." It also states, "The mother . . . shall care for the children all but the first weekend of each month from Friday at [5:00] [p.m.] to Sunday at

---

[5]    *In re Marriage of Burgess* (1996) 13 Cal.4th 25 (*Burgess*).

[6]    *Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*).

[7:00] [p.m.] [¶] . . . The child shall be in the father's care at all other times not specified."[7] The order also provides that "[s]hould mother relocate her primary residence to the children's community[,] the physical custody arrangement of the children will be a week on and a week off rotation between the parents with the exchanges occurring on Fridays at 7:30 p.m." It retained the holiday, summer, and vacation visitation schedule that had been in place.

The court commented that the reason for its legal custody decision turned on the poor coparenting practices and in particular "the poor grades that children had when primarily in the care of their mother." It noted that "[w]hether the cause of those poor grades stemmed from COVID or alternatively predated COVID was a little difficult to discern, but I think it's probably the latter. And the reason I say that is because [S.R.]'s grades were failing grades even before COVID. So it makes it more likely in my view that L.R.'s grades also were slipping and her performance in school was slipping similar to her brother's [pre-COVID]."

The court also said that the parenting environment at Mother's was not very structured, which "created in all likelihood a detrimental effect on the children's grades." The court told the parties that having "a little bit less structure from time to time" was acceptable, but there is "a need for parents to encourage through structure of their children to succeed in school. And so

[7] The language of the written order appears internally contradictory. Although it states the children shall primarily reside with Father, it also states Mother shall care for the children at all times other than the first weekend of the month. It appears the court intended to award primary physical custody to Father at all times other than the weekends, and Mother was to care for the children all weekends other than the first weekend of each month. However, that is not what the order says.

I think we need to empower that to occur, and the best way I see as being able to do that is from the legal custody that I put in place."

The court stayed the move-away order for 30 days, but the legal custody order was effective as of the date of the hearing.

Mother appealed on September 8, 2021.

DISCUSSION

A. Legal Principles

In an initial custody determination, the court applies a " 'best interest' " analysis, which gives the court wide discretion to choose a parenting plan in the best interests of the children based on all the circumstances. (*Ragghanti v. Reyes* (2004) 123 Cal.App.4th 989, 996 (*Ragghanti*); Fam. Code,[8] § 3040, subd. (a).) Once an arrangement has been deemed by the court to be in the best interest of the child, the court should not revisit that analysis. Instead, the custodial arrangement should be maintained unless there is a significant change in circumstances indicating a different arrangement would be in the child's best interest. (*Burgess, supra*, 13 Cal.4th at p. 38.)

Accordingly, " '[o]rdinarily, *after a judicial custody determination*, the noncustodial parent seeking to alter the order for legal and physical custody can do so only on a showing that there has been a substantial change of circumstances so affecting the minor [children] that modification is essential to the [children]'s welfare. [Citation.] As we have explained: "The [changed circumstance] rule requires that one identify *a prior custody decision based upon circumstances then existing* which rendered that decision in the best interest of the child. The court can then inquire whether alleged new

---

[8]     Further undesignated statutory references are to the Family Code.

circumstances represent a significant change from preexisting circumstances, requiring reevaluation of the child's custody." ' " (*In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 761 (*Biallas*).) Thus, when a noncustodial parent seeks a change in custody, he or she must offer "proof that, due to a substantial change in circumstances, it would be in the best interest of the child to change the custody order." (*Id.* at p. 759, citing *Burgess, supra*, 13 Cal.4th at pp. 37-38.)

This test is an adjunct test that provides that the established custody arrangement should be preserved unless a change in circumstances indicates a different arrangement would be in the child's best interests. (*Ramsden v. Peterson* (2022) 76 Cal.App.5th 339, 344.) "The changed circumstances test requires a threshold showing of detriment before a court may modify an existing final custody order that was previously based upon the child's best interest." (*Ragghanti, supra*, 123 Cal.App.4th at p. 996.) " 'The reasons for the rule are clear: "It is well established that the courts are reluctant to order a change of custody and will not do so except for imperative reasons; that it is desirable that there be an end of litigation and undesirable to change the child's established mode of living." ' " (*Christina L. v. Chauncey B.* (2014) 229 Cal.App.4th 731, 738 (*Chauncey B.*).)

Further, "[i]n a 'move-away' case, a change of custody is not justified simply because the custodial parent has chosen, for any sound good faith reason, to reside in a different location, but only if, as a result of the relocation with that parent, the child will suffer detriment rendering it ' "essential or expedient for the welfare of the child that there will be a change." ' " (*Burgess, supra*, 13 Cal.4th at p. 38.) In move-away situations, "the trial court has broad discretion to modify orders concerning contact and visitation to minimize the minor children's loss of contact and visitation with

10

the noncustodial parent in the event of a move, e.g., by increasing the amount of visitation with the noncustodial parent during vacations from school, allocating transportation expenses to the custodial parent, or requiring the custodial parent to provide transportation of the children to the noncustodial parent's home." (*Id*. at p. 40; see also § 3011, subds. (a)(1) & (a)(3) [factors a court must consider regarding effects of relocation on best interest of a minor].) However, a custodial parent's decision to move away is not a change of circumstances. (*Biallas*, *supra*, 65 Cal.App.4th at p. 762.)

We review custody and visitation for an abuse of discretion. (*Burgess*, *supra*, 13 Cal.4th at p. 32.) "This discretion may be abused by applying improper criteria or by making incorrect legal assumptions." (*Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894, 901 (*Jane J.*).) "Because the trial court must exercise its discretion in light of important policy considerations, appellate courts are less reluctant to find an abuse of discretion when custody is changed than when custody is originally awarded. Reversals of changed custody orders have not been uncommon. [Citation.] This is because, ' "[w]hen custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role." [Citation.] This principle avoids an endless round of emotionally and financially draining litigation in family law courts.' " (*In re Marriage of C.T. & R.B.* (2019) 33 Cal.App.5th 87, 97.)

### B. Analysis

Father was the custodial parent of S.R., and Mother had physical custody of L.R. and A.R. Further, Father was moving away from the area where L.R. and A.R. resided. Thus, different criteria were required for S.R.

11

than for L.R. and A.R.[9]  With respect to L.R. and A.R., Father was required to demonstrate there had been such a significant change from preexisting circumstances that affected them that a change in physical custody was essential to their welfare.  (See *Burgess*, *supra*, 13 Cal. 4th at p. 38; *Biallas*, *supra*, 65 Cal.App.4th at p. 761.)  Then, after Father had met this threshold requirement, the court could reevaluate the custody arrangement based on the best interests of the children.  (*Biallas*, at p. 761.)

Mother contends Father failed to demonstrate a change in circumstances, and the trial court failed to find one.  We agree.  It is unclear from the record before us what the court concluded the changed circumstances were that precipitated a modification to the custody arrangement, and thus permitted a broader consideration of the children's best interests.

Father's petition alleged L.R. was under stress during virtual learning from playing a "parental role" because she was expected to help A.R. log into Zoom while also getting ready for school, and because there was a lack of structure in Mother's home, including for example, requiring L.R. to take her clothes from a pile of clean laundry.  Father also alleged L.R.'s grades suffered, and she lacked educational and emotional support at Mother's.  He also explained that Mother had indicated A.R. was diagnosed with a learning disability and potential autism; Mother had taken responsibility over A.R.'s apparent autism diagnosis, and A.R. had an IEP.  However, Father does not

---

9      Although Father never requested an order granting him permission to move away to Temecula, in his bid for physical custody of L.R. and A.R., the court treated the request as having been made.  Mother does not challenge the court's order granting Father continued physical custody of S.R. with increased visitation for Mother.  Accordingly, we do not address this issue in our opinion.  (See § 7501 [custodial parent has right to change residence of child unless removal would prejudice child's rights or welfare].)

articulate any specific, substantial change in circumstances of Mother's parenting or home structure since the initial custody award. He admitted at the hearing that his concerns were the same he had since 2012, well before the custody order was entered in 2018.

Father's appellate brief references "various changes of circumstance," including educational, physical, and mental needs that were remaining unmet under Mother's care. He argues the court made "an inherent finding as to the [changed circumstance] requirement," and he ultimately contends he met his burden because he "demonstrated the threshold showing of detriment to request a modification order." However, this does not clarify for us what constituted the changed circumstance.

It could be L.R.'s poor grades, as the court stated L.R.'s grades were "slipping." However, there is no information in the record showing L.R.'s performance had changed from the time custody was awarded initially, and Mother denied the claim. Further, the court also explained it could not tell if L.R.'s grades were the result of changes to the learning environment due to COVID or if poor grades predated COVID. Because there is no information in the record showing L.R.'s performance had changed, or any information regarding A.R.'s performance in school at all, we cannot be certain this signified " ' "a significant change from preexisting circumstances, requiring reevaluation of the child's custody." ' " (*Biallas*, *supra*, 65 Cal.App.4th at p. 761.)

Even if L.R.'s grades properly constitute a change in circumstance, that says nothing about A.R.'s situation. Perhaps the changed circumstance for A.R. is the autism diagnosis. However, Father does not point us to any evidence in the record that A.R.'s autism diagnosis meant a custody modification was essential to his well-being. Mother was ensuring A.R. was

receiving services, had attended all his IEP meetings, and procured IHSS approval.

The court's discussion of legal custody does not elucidate its reasoning regarding the finding of a changed circumstance. The court never uses the words "changed circumstance" in its discussion or order. It told the parties that "the reason for the legal custody decision [it] made . . . turned more on . . . the poor coparenting practices that have been exercised by these parents, and in particular the poor grades that children had when primarily in the care of their mother." It is not clear if this explanation refers to its decision to award Father primary legal custody to select the children's school locations in the event of a disagreement, or if the court misspoke and intended to articulate a reason for changing primary physical custody from Mother to Father.

The court's custody order itself likewise provides no clarity. The court ordered the parties to share physical custody with one week on and one week off if Mother were to relocate her primary residence to the same physical community as Father. This suggests that Mother's lack of structure may not have been a "changed circumstance[ ]" that was so detrimental to L.R.'s and A.R.'s well-being that it was essential to their welfare that custody be changed. (See *Ragghanti*, *supra*, 123 Cal.App.4th at p. 996; see also *Chauncey B.*, *supra*, 229 Cal.App.4th at p. 738.)

As our discussion of various possibilities here demonstrates, it is difficult to tell whether the court applied the appropriate threshold test at all. Its failure to properly identify and evaluate the changed circumstances before

addressing the factors detailed in *LaMusga*, *supra*, 32 Cal.4th 1072 and *Burgess*, *supra*, 13 Cal.4th at p. 32, constitutes an abuse of discretion.[10]  (See *Jane J.*, *supra*, 237 Cal.App.4th at p. 903.)

## DISPOSITION

The August 10, 2021 custody order that adopts the Family Court Services report dated July 29, 2021 with modifications and awards Father primary physical custody of L.R. and A.R. is reversed.  Mother is awarded her costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

DO, J.

BUCHANAN, J.

---

[10]    Mother contends separately, in connection with her request for judicial notice, that it was error to grant Father's request for primary physical custody because he now faces criminal charges in a different matter.  We deny Mother's request for judicial notice, as it regards matters that were not before the court at the time of its custody decision.

15