Filed 1/27/26  Marriage of Martin CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JOHN ERIC MARTIN and DANIELLE JEAN MARTIN. | |
| JOHN ERIC MARTIN, Appellant, v. DANIELLE JEAN MARTIN, Respondent. | D085339 (Super. Ct. No. 23FL008641C) |

APPEAL from an order of the Superior Court of San Diego County, Christopher S. Morris, Judge.  Affirmed.

Dell'Acqua Law, Dawn M. Dell'Acqua and Ariel M. Barbre for Appellant.

Cage & Miles and John T. Sylvester for Respondent.

John Eric Martin appeals an order permitting his former wife, Danielle Jean Martin, to move to Tacoma, Washington with the parties' minor children.  He contends that, for each of ten reasons, the order should be reversed.  We disagree.  Hence we affirm.

### *Legal Principles Pertaining to Move Away Cases*

To supply context for this appeal, we begin with a brief introduction to legal principles governing judicial decisionmaking in the context of what are colloquially referred to as move-away cases.  The two leading cases in this area are *In re Marriage of Burgess* (1996) 13 Cal.4th 25 (*Burgess*) and *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*).  Each of these cases involved a situation in which a mother requested an order permitting her to move with her minor children to a location that was distant from the area in which she and the children's father each resided (a move-away order).

*Burgess* involved a situation that was similar to the present case in that final custody orders had not issued at the time the mother's request for a move-away order was heard.[1]  (*Burgess, supra*, 13 Cal.4th at pp. 29, 31.)  Because the custody orders in place at the time were only temporary, the trial court's ruling on the request for a move-away order was considered an initial custody determination.

Discussing initial custody determinations generally, the court said that: "In an initial custody determination, the trial court has 'the widest discretion to choose a parenting plan that is in the best interest of the child' " and "must look to *all the circumstances* bearing on the best interest of the minor child"— including, among other circumstances, " '[t]he health, safety, and welfare of the child,' " " '[a]ny history of abuse by one parent against the child or against the other parent,' " and " '[t]he nature and amount of contact with both

---

[1]     Although the custody orders in place at the time of the trial in *Burgess* were only temporary, the court discussed not only principles governing the resolution of requests for move-away orders in situations in which temporary custody orders were in place (*Burgess*, 13 Cal.4th at pp. 31–36), but also principles governing the resolution of such requests in situations in which final custody orders had been entered.  (*Id.,* at pp. 37–40.)

parents.' " (*Burgess, supra,* 13 Cal.4th at pp. 31–32, quoting in part Fam. Code, §§ 3011, subds. (a)-(c), 3040, subd. (b).)

Then, shifting to the topic of initial custody determinations in the specific context of a request for a move-away order, the court added that, in addressing such a request, "[t]he trial court must . . . consider, among other factors, the effects of relocation on the 'best interest' of the minor children, including the health, safety, and welfare of the children and the nature and amount of contact with both parents" (*Burgess, supra,* 13 Cal.4th at p. 34, citing and quoting Fam. Code, § 3011, subds. (a) & (c)), as well as "the child's age, community ties, and health and educational needs." (*Burgess,* at p. 39.)

The *Burgess* court further explained that "bright line rules in this area are inappropriate" and that "each case [instead] must be evaluated on its own unique facts." (*Burgess, supra*, 13 Cal.4th at p. 39.) But it also observed that, in most instances, a child's relationship with their primary caretaker would prove the most decisive factor. (*Ibid.* ["the interests of a minor child in the continuity and permanency of custodial placement with the primary caretaker will most often prevail"].)

Several years after *Burgess* issued, the Legislature in essence codified it by adding to the Family Code a provision stating that: "It is the intent of the Legislature to affirm the decision in *In re Marriage of Burgess* . . . and to declare that ruling to be the public policy and law of this state." (Fam. Code, § 7501, subd. (b), as amended by Stats. 2003, ch. 674, § 1; see also *LaMusga, supra,* 32 Cal.4th at p. 1089.)

Several years after the Legislature codified *Burgess,* our Supreme Court issued its opinion in *LaMusga.* Unlike *Burgess* and the present case, *LaMusga* involved a situation in which the custody orders that were in place at the time of the trial on the request for a move-away order were final rather

3

than temporary. (*LaMusga, supra,* 32 Cal.4th at pp. 1078, 1080–1081.) Thus it required a somewhat different analysis. (*Burgess, supra,* 13 Cal.4th at pp. 37–40.) Nonetheless, *LaMusga* is instructive inasmuch as it reiterated and reaffirmed each of the statements from *Burgess* that we have quoted *ante* (*LaMusga,* at pp. 1087–1089, 1101) and inasmuch as it reinforced, not only *Burgess'*s emphasis on the paramount importance of the best interests of the child, but also the breadth of the trial court's discretion in addressing a request for a move-away order. (*LaMusga,* at p. 1089 [noting that, "[i]n all but two cases [citations], the Courts of Appeal have affirmed the superior court's exercise of discretion" in addressing requests for move-away orders; and that those two cases "involved unusual circumstances," (*id.* at p. 1092) adding that "[w]e will generally leave it to the superior court to assess [the] impact [of a proposed move on a child] in light of the other relevant factors in determining what is in the best interests of the child," (*id.* at p. 1097) and further stating that "we must permit our superior court judges—guided by statute and the principles we announced in *Burgess* and affirm in the present case—to exercise their discretion to fashion orders that best serve the interests of the children in the cases before them" (*id.* at p. 1101)].)

Guided by *Burgess* and *LaMusga*, courts of appeal have held that " 'when the trial court is faced with a request to modify the existing custody arrangement on account of a parent's plan to move away (unless the trial court finds the decision to relocate is in bad faith), the trial court must treat the plan as a serious one and must decide the custody issues based upon that premise." (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 22 (*F.T.*), quoting *Ruisi v. Thieriot* (1997) 53 Cal.App.4th 1197, 1205–1206; *Jacob A. v. C.H.* (2011) 196 Cal.App.4th 1591, 1601 (*Jacob A.*) [court-appointed mediator was required "to presume mother was relocating to Washington, with or without

4

[child]"]) and that " '[t]he question for the trial court is not whether the parent may be *permitted* to move; [but rather] what arrangement for custody should be made [if and when the custodial parent moves].' " (*F.T.,* at p. 22, quoting *Ruisi,* at p. 1206.)

The courts of appeal also have held that, while the effect that a move-away would have on a child's bond with the parent left behind is certainly a relevant factor to consider, a trial court should not place undue emphasis on it. (*F.T., supra,* 194 Cal.App.4th at p. 23 [reversing trial court order that placed "undue . . . emphasis on the probability that [one parent]'s proposed move with [c]hild to Washington could be detrimental to [c]hild's relationship with [other parent]"]; see also *LaMusga, supra,* 32 Cal.4th at p. 1095 [agreeing with observations that " '[t]here is inevitably a significant detriment to the relationship between the child and the noncustodial parent' whenever the custodial parent relocates with the children" and that, " 'if evidence of some detriment due to geographical separation were to mandate a change of custody, [then] the primary custodial parent would never be able to relocate.' "].)

As our high court has remarked, move-away cases often "involve heart-wrenching circumstances." (*LaMusga*, *supra,* 32 Cal.4th at p. 1101.) In most cases, "frequent interaction with both parents is in a child's best interests, that is the ideal." *(Jacob A., supra,* 196 Cal.App.4th at p. 1601.) "[H]owever, when one of the parents has stated an intent to relocate out of state, such a result is no longer possible." *(Ibid.)* When that happens, "[t]he court must. . . navigate the delta between the ideal and the reality and consider what is in the child's best interests under the circumstances presented." *(Ibid.)*

With these principles in mind, we turn to the specific circumstances presented in the case before us.

## I. FACTUAL AND PROCEDURAL BACKGROUND

John and Danielle wed in 2012.[2]  Over the ensuing eight years they had two children, now aged nine and five.  During this time, John continued to pursue his career as an officer in the U.S. Navy.  Meanwhile Danielle, a teacher with a graduate degree in counseling and psychology, set her career aside when their first child was born and became a stay-at-home parent.

In 2023, while the family was residing in San Diego, John (still employed by the Navy) and Danielle (still a stay-at-home parent) separated.  That same year John filed a petition for dissolution of the marriage, and Danielle filed a response and request for orders (RFO).

Among the forms of relief Danielle requested in the RFO were orders to govern child custody, child support, spousal support, and payment of attorneys' fees and costs.  Also included in the RFO was a request for a move-away order permitting Danielle to relocate with the children to Anacortes, a city in the state of Washington where she and John owned a house.

John opposed the request for a move-away order, but a family court services (FCS) mediator (the mediator) issued a report in which he recommended that the request be granted.  And, 11 months after Danielle had filed the RFO, the court presided over a two-day trial[3] at the conclusion of which it issued a ruling, captioned "Final Statement of Decision and

---

[2]    Because the parties share the same last name, we refer to them here by their first names.  We do so for the sake of clarity, intending no disrespect.

[3]    Seven witnesses testified at the trial:  Danielle; John; the mediator; John's mother; John's commanding officer in San Diego; a friend of John's who was the children's godfather; and one of  the children's teachers, who also owned and operated the school the children attended.

Ruling on Child Custody and Visitation (Relocation)" (the move-away order), permitting Danielle to move with the children to Tacoma, Washington.

Notably, the relief that the court granted differed from the relief that Danielle had requested in the RFO; that John had opposed in his responsive declaration; and that the mediator had recommended in his report. This is because, during the 11 months that elapsed between the filing of the RFO and the commencement of the trial, Danielle had changed her mind about moving to Anacortes, and had decided instead to move to Tacoma—a more affordable city where she had been raised, where her family still lived, and which was located an hour and a half closer than Anacortes to the Seattle-Tacoma International Airport that serves both cities. (We discuss the change, from Anacortes to Tacoma, *post*.)

During the trial, the court expressed its view that John and Danielle "are both good parents and that the kids are sufficiently bonded with both of them." Likewise, in the move-away order, the trial court said, "It is clear . . . that both parents love and cherish the children and [that] the feeling is mutual.") But so too was "it . . . clear to the court that the primary caregiver is [Danielle]."

In support of this determination, the court observed that:

> "Due in large part to [John]'s commitments to the Navy, during the course of the marriage [Danielle] has taken the laboring oar when it comes to the day-to-day activities of caring for the two children. It is undisputed that [John] worked long hours and, during the course of the marriage, he was deployed overseas three times, twice by himself and on[c]e with the family. . . . During the marriage, [Danielle] did not work outside of the home. In addition, [John] often traveled for work. The evidence was clear that during the marriage, [Danielle] was the one who scheduled and attended the children's doctors' appointments and was the parent most dialed into the day-to-[day] school related

7

activities of the children. She was also the one who was primarily responsible for the children's bedtime routines and getting them ready for school in the morning. Since the implementation of the FCS schedule, [John] certainly has overseen the day-to-day caregiving during his approximate 28% timeshare. Although the evidence also showed that he depends on his parents, with whom he currently resides, to assist in parenting during his parenting time while he is working."

The court also expressed some reservations relating to Danielle's plans and motivations. Thus, for example, it described her plans relating to housing and employment in Washington as "somewhat conceptual."[4] And it expressed "grave concerns about Danielle's ability to allow [John] to remain an active presence in [the] children's lives."[5]

Acknowledging an argument John had made regarding the motivations behind Danielle's request, the court said that Danielle's mixed record on co-parenting, coupled with her "somewhat conceptual plan related to housing and employment in Washington" had led it to "struggle" with "whether or not

---

[4]     In describing Danielle's plans relating to housing and employment in Washington as "somewhat conceptual," the court was referring in part (1) to testimony in which Danielle had indicated she was intending that she and the children initially would reside with her parents in Tacoma, as "a transition to kind of get myself on my feet," before renting a home of their own; and (2) to the fact that, although Danielle testified to personal connections supporting an inference of strong employment prospects at Tacoma area schools, she also acknowledged in her testimony that she had not submitted applications to any school district.

[5]     These concerns were supported by findings the court had made to the effect that Danielle had made disparaging comments about John's parenting; had often called the children during John's parenting time to quiz them about his activities with him; had "attempted to exploit anything she viewed as a parental misstep" by John; and "ha[d] proven to be an especially difficult co-parenting partner."

8

an inference should be drawn that [Danielle]'s primary motivation in making [her] request [for a move-away order] is to thwart and interfere with [John]'s parenting relationship." But notwithstanding the concerns it had expressed, the court ultimately decided not to draw such an inference, in part because the concerns had been mitigated by "evidence . . . that[,] since court involvement, [Danielle had] made a concerted effort to peacefully co-parent with [John]" and by a lack of evidence that the children were reluctant to be with John—which "indicate[d] to the court that [Danielle] ha[d] made an effort to conceal her emotions from" them.

In addition to expressing grave concerns about Danielle's plans in the event she were permitted to relocate the children with her to Tacoma, the court expressed grave concerns about *John's* plans in the event the children were to remain behind with him. Whereas the court concluded Danielle's plans were "somewhat conceptual," it concluded that John's were unrealistic:

> "Of particular concern to the court is [John]'s current and future commitments to the U.S. Navy. [John] testified that in short order he will be transferred to the Naval Air Station at Point Magu. [John]'s plan is to make the approximately 2.5-hour drive (2.5 hours without traffic) every day, twice. [John]'s plan would necessarily entail him leaving in the morning before the children wake up and arriving home at, or just before, bedtime. [John]'s parents would be parenting the children when he is not there. [John]'s new orders also have him going to Jacksonville, Florida, for training, from January 4, 2025, to March 15, 2025. During this time, again, the parenting of these children would fall to his parents. Obviously, the court has grave concerns about the feasibility of [John]'s plan. Waking up and getting on the road before dawn, working the required 8-10 hour shift, and then getting back on the road to fight Los Angeles traffic in a desperate attempt to see the children before they fall asleep, only to wake up and do it again and again, day after day, seems an unworkable plan destined for failure. It is much more

9

likely that [John]'s parents will become the day-to-day caregivers for the children—an outcome the court is reluctant to impose on this family.

The court stated in its conclusion:

"Father's commitments to the Navy, while admirable, will require him to be absent for much of the parenting and will require his parents to take on a substantial part of the parenting role. That gloomy prospect weighs heavily in the court's decision."

In arriving at its decision, the court distilled the pertinent considerations down to nine factors and concluded that one of the factors—the children's relationships with the parents—was neutral, three of the remaining factors favored Danielle, and the remaining five factors favored John. The factors that the court concluded weighed in favor of Danielle were: 1) the children's "interest in stability and continuity in [the] custodial arrangement," which the court characterized as the "primary factor"; 2) their age, which the court said weighed "heavily" in favor of Danielle; and 3) the impracticability of John's plan for the children in the event that Danielle's move were to result in custody being awarded to him.

The factors that the court concluded weighed in favor of John were: 1) Danielle's "ability to communicate and cooperate," which the court said weighed "heavily" in favor of John; 2) the distance of the move; 3) uncertainties associated with Danielle's housing and employment plans; 4) the children's strong bond with John's parents (who live with him in San Diego) as compared with Danielle's family (who live in Tacoma); and 5) the switch from a private Japanese immersion school in San Diego in which the children "appear[ed] to be thriving," to schools in Tacoma the quality and suitability of which were not as well known.

Weighing all of these factors, the trial court decided—albeit not without reservations[6]—that it would "grant the request that the children continue to live primarily with [Danielle in Tacoma] as it is in their best interests and will protect their health, safety and welfare."

The court also imposed a 30-day stay of the move-away order. During the pendency of this stay, John filed an ex parte application seeking reconsideration of the order, an extension of the stay, and a status conference to address changes that should be made to the parties' parenting plan in advance of any move. The trial court denied the requests for reconsideration, and it granted the request for a status conference.

Pending the status conference, John sought writ relief from the court of appeal. A panel from this court issued an order temporarily staying the move-away order pending further review. Then, nine days later, that panel denied the writ and dissolved the temporary stay.

Thereafter, John timely appealed the move-away order.

During the pendency of the appeal, the trial court conducted the status conference John had requested,[7] and modifications to visitation and various other aspects of the parties' parenting plan were made by the court.

---

[6]    The court expressed its "grave concerns about [Danielle]'s ability to allow [John] to remain an active presence in these children's lives" (see *ante*) in the sentence immediately following the sentence in which it stated its decision to grant Danielle's request for a move-away order. In the sentence after that, the court said: "Should [Danielle] impede or interfere with [John]'s parenting, the court will move quickly to take the steps necessary to ameliorate that situation."

[7]    The status conference occurred three months after the move-away order issued.

11

## II. DISCUSSION

### A. John's Contentions

In his opening brief, John contends the move-away order should be reversed for each of 10 reasons: (1) "the order exceeded the relief Danielle requested"; (2) "there was no meaningful mediation"; (3) "the court erred by giving undue weight to mother's assertion of the primary caregiver status"; (4) "evidence overwhelmingly supported Danielle's intention to frustrate John's contact with the children by the move"; (5) "the court misunderstood the father's upcoming work schedule and this negatively impacted its decision"; (6) "the court did not consider evidence supporting abuse against father perpetrated by mother as required by Family Code section 3011"; (7) "the court erred by failing to consider all other circumstances bearing upon the children's best interests"; (8) "the evidence supported a finding that Danielle was acting in bad faith"; (9) "the court misunderstood the difficulty [that] travel to Washington and father's navy requirements presented for John to have visitation with the children"; and (10) "the court failed in its final decision to render custody orders as requested by the parties." We examine each of these arguments *post* in the order in which John has presented them.

### B. The Standard of Review

In examining John's arguments, we apply the abuse of discretion standard. (*Burgess, supra*, 13 Cal.4th at p. 32 ["[t]he standard of appellate review of custody . . . orders is the deferential abuse of discretion test," "[t]he precise measure [of which] is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child"], *LaMusga, supra,* 32 Cal.4th at p. 1086 [same].) "Under an abuse of discretion standard, we review the trial court's legal conclusions de novo and its factual findings for substantial evidence, and we reverse its application of

the law to the facts only if it was arbitrary and capricious." (*Swan v. Hatchett* (2023) 92 Cal.App.5th 1206, 1215 (*Swan*); *In re Caden C.* (2021) 11 Cal.5th 614, 641 (*Caden C.*) ["A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' "].) Consequently, a reviewing court has no authority to substitute its decision for that of the trial court if more than one inference can reasonably be deduced from the facts (*ibid.*), and it "should interfere only ' "if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did." ' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 (*Robert L.*).)

As our Supreme Court has said, "where . . . 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards.' " (*Caden C., supra,* 11 Cal.5th at p. 641.) Under the substantial evidence standard, "determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.,* at p. 640; see also *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582 (*Schmidt*) ["[o]ur job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events."].) "This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. . . . Under

13

this standard of review, parties challenging a trial court's factfinding bear an 'enormous burden.' " (*Schmidt,* at pp. 581–582.)

## C. The Prejudicial Error Rule

If our review of the proceedings below reveal error, then we must further consider whether such error is harmless. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107–1108.) As our Supreme Court has observed, " 'reversible error is a relative concept,' " " 'whether a slight or gross error is ground for reversal depends on the circumstances in each case,' " and a reviewing court reverses a judgment " 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*); see also *Sabato v. Brooks* (2015) 242 Cal.App.4th 715, 724–725 (*Sabato*).)

"A reasonable probability for these purposes does not mean an *absolute* probability" (*Sabato, supra,* 242 Cal.App.4th at p. 725), nor does it mean "more likely than not." (*Cassim, supra,* 33 Cal.4th at p. 800.) Rather, it means "merely a *reasonable chance*, more than an *abstract possibility*" (*ibid.*), and "[t]he test is satisfied, and prejudice appears, if the case presents 'an equal balance of reasonable probabilities.' " (*Sabato,* at p. 725.)

## D. Analysis

### 1. John's contention that "the order exceeded the relief Danielle requested"

John's first contention is that the move-away order "exceeded the relief Danielle requested" inasmuch as the city to which her RFO had indicated she would be moving was Anacortes. In essence, he contends he was blindsided by the switch from Anacortes to Tacoma.

The record on this contention is mixed. It reveals on the one hand that Danielle disclosed nine and a half weeks before the trial that she was *contemplating* moving to Tacoma instead of Anacortes.[8] But it also is susceptible of an inference that a *decision* to opt for Tacoma instead of Anacortes was not conveyed to John until the filing of Danielle's trial brief, just one week before the trial commenced.

Although these circumstances ordinarily would warrant an inquiry into whether John had been afforded adequate notice and an opportunity to be heard, we do not engage in such an inquiry in this case because John forfeited this issue by not objecting on due process grounds, or by requesting a continuance of the trial. (*In re Marriage of R.K. & G.K.* (2025) 113 Cal.App.5th 14, 21–24 (*R.K.*); *Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 449 (*Jacobs*).) Thus we find no error in the variance between the relief requested in the RFO and the relief granted in the order before us.

## 2. John's contention that "there was no meaningful mediation"

John's second contention is that "there was no meaningful mediation." In John's words:

> "There can be no meaningful mediation when the centerpiece of the discussion is whether the children should move to a destination that changes later after the mediation has occurred without returning to mediation.
> "[¶ . . .¶]
> "When Danielle changed her mind about the location of where she wanted to move, the court should have sent the

---

[8] This disclosure occurred during Danielle's deposition. John contends the deposition transcript was not admitted in evidence, but the record reveals otherwise.

parties back to mediation for the mediator to consider new information and update the recommendations and report, accordingly."

But this contention is vulnerable to the same forfeiture analysis discussed *ante* in connection with the contention that the move-away order exceeded the relief requested.[9] (*R.K., supra,* 113 Cal.App.5th at pp. 21–24; *Jacobs, supra,* 14 Cal.App.5th at p. 449.). Thus we find no error in the fact that the parties were not required to return to mediation after Danielle had revealed that she was moving to Tacoma instead of Anacortes.

3.      **John's contention that "the court erred by giving undue weight to mother's assertion of the primary caregiver status"**

John's third contention is that "the court erred by giving undue weight to mother's assertion of the primary caregiver status." In making this contention, John invites us to do something that the law does not permit a reviewing court to do, namely to reweigh evidence. (*Swan, supra,* 92 Cal.App.5th at p. 1215 [" '[a]ppellate courts "do not reweigh evidence or reassess the credibility of witnesses" ' "].) The evidence adduced at trial included extensive testimony supporting the findings (see *ante*) on the basis

---

9      This contention also is vulnerable to testimony by the mediator that his recommendation "was for Washington," "didn't focus on where in Washington," and "would . . . still be the same if [Danielle] was moving to Tacoma, Washington instead of Anacortes, Washington."

of which the court concluded "that the primary caregiver is [Danielle]."[10]  In other words, substantial evidence supported the determination that Danielle was the children's primary caregiver.[11]  (See *Caden C., supra,* 11 Cal.5th at pp. 640-641; *Schmidt, supra,* 44 Cal.App.5th at pp. 581–582; *Robert L., supra,* 21 Cal.App.4th at p. 1067.)

---

[10]     In support of his contention that the trial court erred in determining Danielle was the children's primary caregiver, John argues:  (1) that the court should not have credited input from the mediator because the mediator had merely *assumed* Danielle was the primary caregiver; (2) that the court failed to credit testimony of John and other witnesses supporting an inference that John was "as equal . . . a primary co-parent as [Danielle] was"; and (3) that the court should have credited such testimony because it did not make findings that his or the other witnesses' testimony was lacking in credibility.  But we are not persuaded.  The court heard plentiful testimony (primarily from Danielle but also from other witnesses apart from the mediator) supporting an inference that Danielle was the children's primary caregiver, and it made no findings that this testimony was lacking in credibility.  Under the applicable standard of review, such testimony amply suffices to support the move-away order.  (See *Schmidt, supra,* 44 Cal.App.5th at pp. 581–582 ["[o]ur job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events"]; Eisenberg et al., Cal. Practice Guide:  Civil Appeals and Writs (The Rutter Group 2024) ¶ 8:52, p. 8-26 ["[t]he testimony of a single credible witness—even if a party to the action—may constitute 'substantial evidence' "]; accord *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [" 'The testimony of a witness, even the party himself, may be sufficient.' "].)

[11]     John contends the court focused on the wrong timeframe in arriving at its conclusion that Danielle was the primary caregiver.  But the evidence adduced at trial supported the court's conclusion in this regard as to *all* periods of the children's lives.

### 4. John's contention that "evidence overwhelmingly supported Danielle's intention to frustrate John's contact with the children by the move"

John's fourth contention is that the "evidence overwhelmingly supported Danielle's intention to frustrate John's contact with the children by the move." Certainly there was evidence supporting an inference that Danielle's move might have been motivated by an intention to thwart John's relationship with the children. Indeed, as discussed *ante*, the court "struggled" with John's argument that it should draw just such an inference. But, relying on substantial evidence supporting alternative and contrary inferences, the court resolved this struggle in favor of granting Danielle's request.

Substantial evidence that Danielle's move was motivated by factors other than an intention to frustrate John's contact with the children included Danielle's testimony to the effect that: she would have better housing and employment prospects, and a stronger family support system for herself and the children, in Tacoma; the school experience and educational opportunities for the children would be improved in the area to which she anticipated moving in Tacoma as compared with the school the children were attending in San Diego; and the children would have improved opportunities to learn about their native American cultural heritage in Tacoma.[12]

Substantial evidence that Danielle, not only was motivated by factors other than an intention to frustrate John's contact with the children, but that she in fact desired to promote such contact included her testimony that: she

---

[12] Danielle testified that she is Turtle Mountain Chippewa on her mother's side, that she is an enrolled member of the tribe, and that she planned to enroll the children in the tribe.

18

believed it was important for John to be in the children's lives; she was "going to encourage and foster . . . [and] continue to" foster his bond with the children; she hoped John's bond with the children would improve over time; she had completed a co-parenting course; she encouraged the children to call John, and would have no issue with their speaking with him for more than 30 or 40 minutes at a time if they wanted to, while in her care; she would want them to have FaceTime contact with John every week if they moved to Washington; and she would facilitate such FaceTime contact and visits between John and the children.

Such evidence also included these exchanges directed specifically to the topic of whether Danielle might be intending to thwart John's relationship with the children:

> "Q. [T]here [were] . . . allegations that you're trying to move to frustrate contact between Dad and the kids; is that true?
>
> "A. No, not at all.
>
> "Q. Okay. Do you want to allow father to have contact with the [children]?
>
> "A. I do. My dad was always a significant part of my life, and I want—I've always wanted a strong relationship and bond for the [children] and their father, and I've tried to facilitate that the best that I can, and I will continue to do so."

As discussed *ante*, under the substantial evidence standard of review, "[o]ur job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events" (*Schmidt, supra,* 44 Cal.App.5th at pp. 581–582), and we are forbidden to reweigh this evidence. (*Swan, supra,* 92 Cal.App.5th at p. 1215.) Hence the evidence supporting an

19

inference that Danielle's move might have been motivated by an intention to frustrate John's contact with the children does not furnish a basis on which to reverse the trial court's order.

### 5. John's contention that "the court misunderstood the father's upcoming work schedule and [that] this negatively impacted its decision"

John's fifth contention is that "the court misunderstood [his] upcoming work schedule and [that] this negatively impacted its decision." The work schedule to which this contention pertains is one that was due to commence in or about January of 2025 and that was anticipated to endure for 24 months. John testified that, during this 24 month period, he would be posted to two different locations. Specifically, (1) Jacksonville, Florida for flight training that would occur every Monday through Wednesday during a 69-day period commencing in January and ending in March and (2) Point Mugu, California for the remainder of the 24-month period.

John testified: that, during the Jacksonville portion of the posting, he would be commuting by air back and forth between San Diego and Jacksonville every Wednesday and Sunday, such that he could be home in San Diego on the days that he didn't need to be present in person in Jacksonville; and that, during the Point Mugu portion of the posting, he would be commuting by car back and forth between San Diego and Point Mugu Monday through Friday.

In support of his contention that "the court misunderstood [this] . . . schedule and [that] this negatively impacted its decision," John argues that:

> "The court incorrectly stated: 1) that John's plan was to
> make a 2.5-hour drive each way to Point Mugu daily,
> 2) that he would have to work an 8-10 hour shift, 3) that he
> would have to travel to Jacksonville, Florida for training
> between January 4, 2025 and March 15, 2025, and 4) that

20

he would be unable to parent the children during training
in Jacksonville and would have to rely on his parents who
live with him."

Addressing each of these four assertions of error in turn, we begin by observing that the first is contradicted by John's own testimony. Specifically, John testified during his direct examination that he intended to continue to reside in San Diego while posted to Point Mugu and that the distance between San Diego and Point Mugu was "[a]bout a two and a half hour drive."[13]

Whereas the first assertion of error relating to John's work schedule is contradicted by the record, the second such assertion (that pertaining to the trial court's finding that John "would have to work an 8-10 hour shift") finds support in the record. John's testimony was that his daily shifts at Point Mugu would be from "about 8:00 to 2:30, 3:00 o'clock"[14]—in other words 6.5 or 7 hours, rather than 8-10 hours.

However, we cannot say " 'it is reasonably probable that a result more favorable to [John] would have been reached in the absence of [this] error' " (*Cassim, supra,* 33 Cal.4th at p. 800) inasmuch as—factoring in the duration of the commute and uncertainties associated with the effects of traffic on the commute—it is unlikely that the trial court would have departed from its

---

[13]    On cross-examination John testified that the drive from San Diego to Point Mugu was "two and a half to three hours" in "moderate traffic" and that the return trip was "about [a] three-hour drive without traffic;" however, he also conceded that he was "not familiar enough" with the route to say whether he would be likely to encounter traffic on the way back to San Diego.

[14]    In a letter John submitted in support of his application for reconsideration, his commanding officer at Point Mugu described John's shift as "Monday thru Friday 0730 to 1430, with most Fridays complete by 1200."

21

view that John's work commitments would "require him to be absent for much of the parenting," that they would "require his parents to take on a substantial part of the parenting role," and that his plan was, therefore, "unworkable" and "destined for failure."  (See *ante*.)

The third and fourth assertions of error relating to John's work schedule (those pertaining to the nature and duration of his Jacksonville posting and their effect on his availability to parent the children) find support in the record inasmuch as his testimony was that he would be spending about half of his time in San Diego during the ten-week posting to Jacksonville.[15] But, again, we cannot say " 'it is reasonably probable that a result more favorable to [John] would have been reached in the absence of [this] error' " (*Cassim, supra,* 33 Cal.4th at p. 800) because:  (1) when not posted to Jacksonville, John would be posted to Point Mugu; and (2) it is clear from the move-away order (see *ante*) that the court was no less troubled by the logistics of John's plan for parenting the children while posted to Point Mugu than by the logistics of his plan for parenting them while posted to Jacksonville.

---

[15]  In a letter John submitted in support of his ex parte application for reconsideration of the move-away order, his commanding officer at Jacksonville said that his "training plan [was] scheduled to be complete 26 February, 2025 well in advance of the 69 days he is scheduled on his orders."  However, this information did not surface until after the judgment had issued; and, for the reasons set forth above, it is not reasonably probable that it would have led to a result more favorable to John even if it had been available to the trial court at the time of the trial.

**6. John's contention that "the court did not consider evidence supporting abuse against father perpetrated by mother as required by Family Code section 3011"**

John's sixth contention is that "the court did not consider evidence supporting abuse against father perpetrated by mother as required by Family Code section 3011."[16] This contention pertains to the trial court's ruling sustaining a hearsay objection in response to John's effort to introduce at trial a two-page document reporting the findings of a Navy "incident determination committee" (IDC) that had met the preceding April "to consider . . . allegations of spouse emotional abuse involving CDR John E. Martin and his spouse." This document did not articulate any of the allegations that had been made or any of the evidence that had been considered. Instead it merely stated that:

> "After careful consideration of all available information, the IDC [had] determined that the case:
>
> "(a) ( ) met / (✓) did not meet criteria for spouse emotional abuse of Danielle Martin by CDR John E. Martin. Allegation 1

---

16    Family Code section 3011, subdivision (a)(2), provides that: "In making a determination of the best interests of the child in a proceeding described in Section 3021, the court shall, among any other factors it finds relevant and consistent with Section 3020, consider . . . [¶] [a] history of abuse by one parent . . . against [¶] . . . [t]he other parent" and that, "[a]s a prerequisite to considering allegations of abuse, the court may require independent corroboration, including, but not limited to, written reports by law enforcement agencies, child protective services or other social welfare agencies, courts, medical facilities, or other public agencies or private nonprofit organizations providing services to victims of sexual assault or domestic violence." (Fam. Code, § 3011, subd. (a)(2)(A)(ii) and (B).)

"(b)  (✓) met / (  ) did not meet criteria for spouse emotional abuse of CDR John E Martin by Danielle Martin.  Allegation 2"

In explaining its reason for sustaining the objection, the court said:  "I can't assume that I would concur with the Navy's . . . conclusion[s] . . .  That's not fair.  [¶ . . . ¶]  If there's an explanation of what they relied upon, [then] maybe I can look at that, but just their conclusions . . .   I can't assume that the Navy's judgment was proper, and I can't take that for the truth . . . ."

John's counsel responded by (incorrectly[17]) telling the court that "there's also in here . . . a discussion about what was reviewed by the [IDC]." In addition, John's counsel offered to "have [John] testify to the details."  But then she did not follow through by attempting to elicit such testimony from him or from any other witness.

As a consequence, the only evidence of abuse that was presented to the trial court was objectionable both because it was conclusory and because it was hearsay.  The court did not err in excluding this evidence.

---

17    The document's "discussion" of what the IDC reviewed consists in its entirety of a three item list, as follows:  (1) "Service member's statement"; (2) "Family member's statement"; and (3) "Command statement."  None of these three statements is described; and the balance of the document consists of boilerplate information about the IDC process.  When asked during his direct examination whether "an accused party [would] have an ability to respond to any allegations" in an IDC proceeding, John's commanding officer in San Diego responded:  "You can submit a statement, but the information that the accused is given is pretty vague.  So, it can be challenging to direct response to it."

24

**7. John's contention that "the court erred by failing to consider all other circumstances bearing upon the children's best interests"**

John's seventh contention is that "the court erred by failing to consider all other circumstances bearing upon the children's best interests." In support of this contention he argues in essence, that, in granting Danielle's request for a move-away order, the court accorded too much weight to its determination that she was the children's primary caregiver and not enough to the five out of nine factors (see *ante*) that it found weighed *against* granting the request. But, in making this argument, John again is asking this court to do something—reweigh the evidence—that the case law forbids us to do. (*Swan, supra,* 92 Cal.App.5th at p. 1215 [" '[a]ppellate courts "do not reweigh evidence or reassess the credibility of witnesses" ' "]; *LaMusga, supra,* 32 Cal.4th at p. 1093 [ "[t]he weight to be accorded to [the various pertinent] factors [in a move-away case] must be left to the [superior] court's sound discretion;" concluding court of appeal erred "in substituting its judgment for that of the superior court"]; see also *Burgess, supra*, 13 Cal.4th at p. 39 ["[i]n an initial custody determination, the trial court has 'the widest discretion . . . .' "].)[18]

---

[18] John also argues that, in assessing Danielle's request for a move-away order, the trial court should have considered a therapist's diagnosis of one of the children and "the extent to which [that] child . . . was reliant on [the] therapist." But no evidence bearing on these topics was presented to the trial court at the trial that resulted in the move-away order, and (as noted *ante*) John does not appear to have appealed the order denying the application for reconsideration in which he first raised these topics.

### 8. John's contention that "the evidence supported a finding that Danielle was acting in bad faith"

John's eighth contention is that "the evidence supported a finding that Danielle was acting in bad faith."[19] This contention is rooted in a series of statements from *Burgess* and *LaMusga*. In *Burgess*, our Supreme Court formulated a rule that: "In a 'move-away' case, a change of custody is not justified simply because the custodial parent has chosen, for any sound *good faith* reason, to reside in a different location, but only if, as a result of relocation with that parent, the child will suffer detriment rendering it ' "essential or expedient for the welfare of the child that there be a change." ' " (*Burgess, supra,* 13 Cal.4th at p. 38, italics added.) In arriving at this rule, the court observed that a "parent who has been the primary caretaker for minor children is ordinarily no less capable of maintaining the responsibilities and obligations of parenting simply by virtue of a reasonable decision to change his or her geographical location." (*Id.,* at p. 36.) But the court also said that:

> "An obvious exception is a custodial parent's decision to relocate simply to frustrate the noncustodial parent's contact with the minor children. 'Conduct by a custodial parent designed to frustrate visitation and communication may be grounds for changing custody.' [Citations.] Even if the custodial parent is otherwise 'fit,' *such bad faith conduct may be relevant to a determination of what permanent custody arrangement is in the minor children's best interest.*" (*Burgess, supra,* 13 Cal.4th at p. 36*,* fn. 6, italics added.)

Several years later, the court reiterated each of these points in *LaMusga, supra,* 32 Cal.4th at pages 1098–1099.)

---

[19] This contention is substantively analogous to John's fourth contention, *ante,* that the move was intended to frustrate his contact with the children.

Citing the reservations relating to Danielle's plans and motivations that the trial court expressed in the move-away order, John argues that the findings on which the court premised those reservations ipso facto established bad faith. We agree with John that those findings constituted substantial evidence of bad faith. But, as discussed *ante*, when applying the substantial evidence standard "[o]ur job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Schmidt, supra,* 44 Cal.App.5th at pp. 581–582.)

Here there is, not just substantial, but plentiful evidence in the record to support a conclusion that, notwithstanding deficiencies Danielle had exhibited in her co-parenting in the past, she (in the words of the trial court, *ante*) had "made a concerted effort to peacefully co-parent with [John]" following the involvement of the court and that her move to Tacoma was in good faith.[20] On the basis of such evidence, we must conclude substantial evidence supported the trial court's determination that, in requesting an order permitting her to move to Tacoma with the children, Danielle was operating in good faith.

9. **John's contention that "the court misunderstood the difficulty [that] travel to Washington and father's navy requirements presented for John to have visitation with the children"**

John's ninth contention is that "the court misunderstood the difficulty [that] travel to Washington and father's navy requirements presented for John to have visitation with the children." In support of this contention, he

---

[20]   See discussion *ante* of evidence pertaining to Danielle's motivations for the move and to her intention to foster John's relationship with the children.

27

paraphrases the testimony of his commanding officer in San Diego to the effect that:

> "Not only would John have to have the time off available, but he would also need to have coverage available. Even if he was traveling on his off time, he would need permission to leave California. Even after he had secured coverage, received permission to take leave that he had accrued, the Navy could ultimately revoke his leave, which would become more of a risk as he advanced up the chain of command."

But the record reveals that the trial court understood these difficulties and factored them into its analysis. As it wrote in the move-away order:

> "Tacoma . . . is approximately 1200 miles away. There are flights between San Diego and Tacoma. Both parents will ostensibly be employed and have demonstrated they are able and willing to travel. However, evidence was also presented that Father will have to clear travel with his command and, in so doing, will have to ensure that his assignments are covered. This will impose some limitations on his ability to travel while Mother would have no such limitations.

> "This factor weighs against the move."

Thus the work-related challenges that would bear on John's ability to travel to visit the children in Washington were factored into the trial court's analysis; they just didn't carry the day.

**10. John's contention that "the court failed in its final decision to render custody orders as requested by the parties"**

John's tenth and final contention is that "the court failed in its final decision to render custody orders as requested by the parties." John is at least partially correct in this regard, inasmuch as the move-away order does not address requests he had made for visitation and other aspects of the parenting plan to be modified in the event the request for a move-away order

28

were to be granted. But this issue is moot inasmuch as the trial court did end up addressing (and granting most of) these requests at the status conference that occurred at John's request three months after the move-away order had issued.

## E. Conclusion Regarding Claim that Trial Court Abused Its Discretion

Requests for move-away orders routinely present challenging scenarios with "heart-wrenching circumstances" (*LaMusga, supra,* 32 Cal.4th at p. 1101) for the families involved and competing considerations for the trial judges who must decide them. Under the circumstances presented in this appeal, we cannot conclude that the determination the trial court made in this case was "arbitrary, capricious, or patently absurd." ' " (*Caden C., supra,* 11 Cal.5th at p. 641.) Nor can we conclude that, " ' "under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order" ' " (*Robert L., supra,* 21 Cal.App.4th at p. 1067) that the trial court made. Thus we conclude the court did not abuse its discretion.

## III. DISPOSITION

The order permitting Danielle to move to Tacoma with the children is affirmed. Danielle is entitled to costs on appeal.

KELETY, J.

WE CONCUR:

McCONNELL, P. J.

RUBIN, J.

29